[Crim. No. 7398. Second Dist., Div. One. Sept. 18, 1961.]

THE PEOPLE, Respondent, v. ROBERT EMMET
KELLY, JR., Appellant.

Louis Lee Abbott for Appellant.

Stanley Mosk, Attorney General, William E. James, Assistant Attorney General, and George W. Kell, Deputy Attorney General, for Respondent.

WOOD, P. J.—In two counts of an information the defendant was accused of burglary; and in two counts he was accused of grand theft. Trial by jury was waived. By stipulation the case was submitted upon the transcript of the preliminary examination, reserving the right to offer additional evidence. Defendant's motion to set aside the information under section 995 of the Penal Code was granted as to count 2 (charging grand theft) and was denied as to the other counts.[1] Defendant did not testify. He was found not guilty on the other count charging grand theft, and was found guilty on the two counts charging burglary. Probation was granted upon the condition, among others, that defendant spend 60 days in the county jail. Defendant appeals from the judgment.

Appellant contends that the officers obtained the stolen articles by unlawful search and seizure, and therefore the court erred in receiving the articles in evidence over the objection of defendant.

Appellant also contends the court erred in receiving certain admissions of defendant for the reason the admissions were: (a) the proximate result of the unlawful search and seizure; (b) confidential communications "from client to attorney" by means of an intermediary; and (c) the proximate result of failure to arraign defendant before a magistrate without unreasonable delay.

Appellant also contends that the committing magistrate

---

[1]It does appear that, at the close of the case, the judge also said that he found defendant not guilty on count 2, charging grand theft.

erred in permitting an officer to remain in the courtroom during the preliminary examination.

On November 24, 1959, burglary was committed at the office of the R. B. R. Construction Company in Duarte, and a Ramset gun (which is a construction tool) was stolen therefrom.

On November 28, 1959, burglary was committed at the office of the Independence Life Insurance Company in Pasadena, and two typewriters, a calculator, and a Stenorette (dictating device) were stolen therefrom.

On December 15, 1959, Officer Stornie received information from Officer Hovard that an anonymous informant had told him that a man by the name of Kelly had picked locks at a local company and had taken business machines from its office. The informant said he would call again. The next day the informant told Officer Stornie by telephone that Kelly's first name was "Bob," that Kelly had a Ramset gun, and that he (informant) thought that the business machines were in storage at "Cal. Tech." Before receiving that information, Officer Stornie had information that a Ramset gun had been stolen within the last month. Officer Stornie searched the police files in an attempt to "establish the Kelly party," and he found that a person by the name of Robert Kelly had been contacted by officers during October relative to firing a gun in a Pasadena canyon. Officer Stornie also found that a Robert Kelly had purchased several guns in Pasadena, and that the address of the purchaser was the Blacker House at 1301 East California Street (on the campus of California Institute of Technology).

On December 16, 1959, Officer Stornie and Officer Dandrea went to the office of Dean Eaton, in the Administration Building of the Institute, and related to him the information they had received regarding Robert Kelly. The Dean telephoned Dr. Huttenback, the Master of Blacker House, and asked him to come to the Dean's office. When he arrived there, the officers again related the information they had received regarding Robert Kelly; and stated in effect that they suspected that one of the students, the defendant herein, had been involved in a burglary. Dr. Huttenback said that the defendant had been involved in a situation regarding a Ramset gun that had been used to drive several holes in various areas on the campus.

Officer Stornie testified that, in said conversation in the Dean's office, he (officer) asked Dr. Huttenback if he had

access to defendant's premises; he replied that he did have access thereto; the officer asked if Dr. Huttenback had authority to enter the room—what were his limitations to entering the room, or in what manner the dormitory was operated; he replied that he had free inspection rights to all rooms in the dormitory where he was master; the officer said that he did not have a search warrant; Dr. Huttenback said that was no problem—that he could inspect the rooms.

The Dean said to the officers, ''Of course you realize we may require you to have a search warrant.''

Dr Huttenback, called as a witness by the prosecution, testified he is a Lecturer in History and is Master of Student Houses at the California Institute of Technology; that the master has general charge of all resident students at the Institute, that is, those who reside at the four student houses; he has a master key to the rooms; that, with respect to rooms, the normal rights of private property and entry are observed; the defendant resided in the Blacker House, which is one of the four residences at the Institute; he received information from Officer Stornie and another officer that the defendant was suspected of having been involved in a burglary; the officers said that they wanted to determine whether the stolen property was in the defendant's room, and that they wanted to enter the room; he told the officers that under the Student House Rules he was empowered to enter any of the rooms in case of emergency; each room has an individual lock, and keys for the lock are issued to the occupants of the room; when he and the officers went to the defendant's room, the door was closed; he (witness) opened the door; no one was in the room at that time,—the roommate of Kelly was asleep on a porch which adjoined the room; while in the room the officers looked at a Ramset gun, some typewriters, and a dictaphone, and made some notations about them; the officers did not remove the articles from the room at that time.

Officer Stornie testified further that after the conversation in the Dean's office, he (witness), Officer Dandrea, and Dr. Huttenback went to defendant's room; as they approached the room, the door of the room was open at an angle of approximately 35 degrees; as Dr. Huttenback entered the room he pushed the door farther open; when the door was opened wider, and while the officer was outside the room, he observed the tool box which was in the room; then the officer entered the room and again observed the large metal tool box which was at the base of the dresser; he looked under

the bed and in a closet to see if Kelly was in the room; he (witness) saw a Stenorette or recorder in the closet; the roommate of Kelly was on a bed on the porch; the officer asked the roommate if he objected if the officer looked around; he replied that he did not object; the officer removed the Ramset gun (which was in the tool box), the calculator, and the recorder from the room to the police station; he also took two typewriters from the general storage area where the students store their property; when Dr. Huttenback told him (officer) that the rules of the Institute provided that the master or certain other persons might enter a room in an emergency, he (officer) said that "a felony investigation is an emergency."

Dr. Huttenback, when called as a witness by defendant, testified that while he and the officers were in the Dean's office there was conversation as to where Kelly was at that time (approximately 9:40 a. m.); the Dean checked Kelly's schedule and it was said that probably he was taking a final examination in geology, which examination was scheduled for the period from 8 a. m. to 11 a. m. of that day; he (witness) and the officers arrived at Kelly's room about 9:55 a. m.

Defendant was arrested the next morning (December 17, 1959) about 9 o'clock in Dr. Huttenback's office. At the time of the arrest, Officer Stornie asked defendant if he knew why they were there, and he replied in the affirmative. Then the officer said that defendant was familiar with the conversation which was had with Dr. Huttenback that morning. Defendant replied that he would prefer not to say anything. The officer asked defendant about the property, and he replied that he had been instructed not to say anything about it. The officers took defendant to the scene of one of the burglaries (the office of the insurance company) and at that place they told him they were interested in straightening out the matter. He replied that he would like to help them but he had been told not to tell them anything. On the way from the insurance company to the police station, one of the officers said that the lock at that company had been picked, and he asked defendant if he would guess how long it would take to pick the lock at that place. He replied that it possibly would take twenty minutes or more. At the station, one of the officers said that there had been numerous burglaries in Pasadena where the locks had been picked and he believed that defendant was responsible for them. He replied that other than the two burglaries mentioned he had not picked

any locks or committed any other burglaries. At the station the officers took Exhibits 6 (key chain with two keys on it), 7 (a lock pick), and 8 (a wire) from defendant's pockets.

Prior to the arrest, Officer Stornie had been called to the scene of the burglary at the insurance company; and, after an examination of the premises, he determined that the entry had been made by use of a key, or by the lockbolt being shimmed by a tool or piece of celluloid, or by picking the lock.

The superintendent of the R. B. R. Construction Company identified the Ramset gun and the box in which it was kept (Exhibit 1) as the property of the company.

The assistant treasurer of the insurance company testified that the two typewriters, calculator and Stenorette (shown in the photograph, Exhibit 2) appeared to be the same machines which the company owned.

Appellant contends that the officers obtained the stolen articles by unlawful search and seizure, and therefore the court erred in receiving the articles in evidence over appellant's objection. He argues to the effect that "the quarters occupied by the appellant as a student . . . were protected by the Constitutional prohibition against unlawful search and seizure"; that the Master of Student Housing did not have authority to enter the room or to permit the officers to enter the room, under the circumstances here; that there was no emergency within the meaning of House Rules or within "a law enforcement sense"; and that entry cannot be justified on the ground that the officers believed in good faith that the master had authority to permit the entry. He argues further that "there is no such thing as a search of premises on probable cause" and that "Probable cause may be the basis for securing a search warrant or for making an arrest; it does not afford an independent right of entry."

Before the informant telephoned to the police station, the officer had made an investigation of the burglaries, and he knew that a Ramset gun and office machines had been stolen; and he had determined that the entry at the insurance company had been made by using a key, or shimming the lockbolt, or picking the lock. The information furnished by the informant was to the effect that a man by the name of Bob Kelly had picked the lock, had taken business machines from the office, and had stored them and a Ramset gun in the Blacker House at said school. An inspection of the police records, with respect to the name Robert Kelly, revealed that a person by that name had been in difficulty recently with the

police relative to firing a gun in a canyon. The officer also inspected records with respect to the purchase of guns by a Robert Kelly, and from those records obtained a description of that Kelly and found that his address was the Blacker House. While the officers were in the Dean's office they saw appellant's picture which was attached to a student's card. The description of appellant as shown by the picture and as acquired from the conversation with the Dean and the Master of Blacker House indicated to the officers that Kelly, the student, was probably the same person as the Kelly referred to in the police records, and as the Kelly referred to by the informant. In that conversation, the Master of Blacker House made a statement to the effect that appellant had been involved in a situation regarding a Ramset gun that had been used improperly on the campus. At that point in the investigation, the officers had acquired information which would tend to corroborate the information which had been received from the informant. It thus appears from all the information which had been received at that point in the investigation (which included an examination of the scene of one of the burglaries, the information from the informant, the police records, the comparisons of descriptions of the Robert Kellys referred to, and the conference in the Dean's office), that there was reasonable cause for the officers to believe that appellant was involved in the burglaries. When the officers and the master approached appellant's room, the door thereof (according to the testimony of the officer) was about one-third of the way open, and, after the master opened the door wider, the officer, before entering the room, saw a large metal tool box in the room. This further information, acquired by the officer before entering the room, was additional corroboration of information furnished by the informant. The evidence was sufficient to support a finding of probable·cause for arresting appellant.

The Master of Student Housing, who had told the officers that he had a master key and had authority to enter the room, entered the room and permitted the officers to enter it. Blacker House was a student dormitory on the campus of one of the most distinguished educational institutions, and it was reasonable to conclude that it was apparent to the officers, from the conference in the Dean's office, that the Master of Blacker House had general supervisory powers with respect to the occupancy and use of the dormitory rooms. In addition to the ostensible general authority of the master

as indicated by his position in such an institution, and in addition to his general statement that he had authority to enter the room, the master referred specifically to the Student House Rules and told the officers that under those rules he could enter the room in case of an emergency. An officer asserted that a felony investigation is an emergency. The evidence was sufficient to support a finding that the officers believed in good faith that the master had authority to permit them to enter the room. A printed document entitled ''Student House Rules'' was received in evidence. At the beginning of that document it is stated, among other things, that in order to maintain the ideal of a self-governing community, it is the responsibility of every resident House member to practice those principles of consideration for others, mutual cooperation, and personal honor that are a proud tradition of the Institute; and therefore each member must be familiar with and agree to abide by ''the following student-government rules.'' Thereafter the document sets forth 17 specific rules, some of which are prohibitions against defacing property, possessing firearms, possessing intoxicating liquor, installing radio aerials or wire, and storing trunks and large boxes in the rooms. The rule with respect to firearms provides that a person violating ''these rules'' will be subject to immediate dismissal from the student houses. Another rule is that violations of the rules shall be reviewed by the Upper Class Committeemen, but final responsibility lies with the Master of Student Houses. Another rule is that ''The Master may at any time expel a student from the Houses for conduct he considers detrimental to their welfare.'' Rule 10 states that ''The Master of Student Houses, . . . [and other designated persons] may use a master key to open a room in an emergency.'' It thus appears from those rules that the appellant, who occupied a room in the Blacker House, was permitted to be there only by reason of the fact that he was a student at the school and was subject to the rules of the school and to the special rules of the house. Therefore his occupancy of the room was conditional upon his accepting the responsibility of practicing the school's traditional principle of personal honor and upon his agreeing to abide by the house rules. The rules relate in major part to the personal conduct of the students in using the rooms. Under the rules the master has final responsibility with respect to violations of the rules, and he may ''at any time'' expel a student from a house for misconduct. It is implicit in the rules that the appellant had

agreed that the master, in the performance of his duties in upholding the high disciplinary standards and integrity of the school, might enter the room. The express provision in the rules that the master might enter the room in an emergency is not to be construed as excluding or disparaging the implied authority of the master to enter for purposes of maintaining disciplinary control and supervision. A dictionary definition of emergency is ''an unforeseen combination of circumstances that calls for immediate action.'' Of course, such a situation as that which confronted the master with respect to a student harboring stolen property in the room was an unexpected or unforeseen combination of circumstances. Under such circumstances, and especially in view of the reserved right of the master as to disciplinary matters in connection with the use of the room, the master might reasonably have concluded that any delay in ascertaining the facts regarding the use of the room would indicate condonation of wrongful acts and would reflect discredit on the school, and therefore the circumstances called for immediate action. The evidence was sufficient to support a finding that the master and the officers believed in good faith that the situation confronting them with respect to the alleged stolen property in the room was an emergency within the meaning of the rules.

 The circumstances herein, with reference to the right to occupy the room, are quite different from the usual relationship of landlord and tenant. In *People* v. *Roberts,* 47 Cal. 2d 374 [303 P.2d 721], wherein the usual relationship of landlord and tenant existed, the court said (p. 377) that the entry could not be justified on the ground that the officers reasonably believed in good faith that the manager of the apartment house had authority to consent to the entry. After making that statement, the court said: ''The situation here is entirely unlike that in *People* v. *Gorg,* 45 Cal.2d 776 [291 P.2d 469], and *People* v. *Caritativo,* 46 Cal.2d 68 [292 P.2d 513]. In both of those cases the premises searched were part of a private home, it was unclear whether the defendant was a guest, tenant or servant, and the officers had the consent of the owner who purported to have authority to authorize the search. In the present case Mrs. Higgins was a tenant of an apartment, and there is no evidence that the officers had reason to believe that the manager had authority to consent to their entry. The manager testified that she had neither authority nor permission from Mrs. Higgins to enter her

apartment, and in admitting the officers she acted solely at their request on the assumption that they were entitled to enter. Moreover . . . no attempt was made to establish such a belief (good faith belief of authority of manager), and it is clear from the record that the trial court did not base its decision on that ground. The trial court found that the officers reasonably believed that someone inside the apartment was in distress and in need of assistance and they entered for the purpose of giving aid.'' In that case the conviction of the defendant, based in part on the entry, was upheld.

In *People* v. *Gorg, supra,* 45 Cal.2d 776, it was said, at page 783 [291 P.2d 469] : ''Defendant was living in the Stevens home, and it is clear that whether he was in fact a tenant, servant, or guest, Stevens [owner] believed that he had at least joint control over his quarters and the right to enter them, put them at the disposal of defendant's father, and authorize a search thereof. Under these circumstances the officers were justified in concluding that Stevens had the authority over his home that he purported to have, and there was nothing unreasonable in their acting accordingly.''

In *People* v. *Caritativo, supra,* 46 Cal.2d 68 [292 P.2d 513], wherein the officers searched defendant's room on the Landsburghs' estate, it was said (p. 73) that the caretaker and Mrs. Landsburgh believed they had joint control over defendant's quarters and the right to enter them and to authorize a search thereof; and that under those circumstances the officers were justified in concluding that the caretaker and Mrs. Landsburgh had the authority they purported to have. It was held therein that the search was not unlawful.

In the present case, a summary of the above conclusions with respect to entering the room is : (1) Before the officers approached the room they had reasonable cause to believe that appellant was involved in the burglaries. (2) As the officers approached the room (and prior to entering it), they acquired, by observation, additional information which corroborated the informant's statements, that is, they observed through the open door a large tool box. (3) The evidence was sufficient to support a finding of probable cause for arresting appellant. (4) The evidence was sufficient to support a finding that the officers believed in good faith that the master had authority to permit them to enter the room. (5) It was implicit in the rules that the appellant had agreed that the master, in the performance of his duties, might enter the room. (6) The evidence was sufficient to support a finding

that the master and the officers believed in good faith that the situation confronting them with respect to the alleged stolen property in the room was an emergency which, under the rules, would justify their entry into the room.

Appellant asserts further that since the arrest was not made until the next day after the search of the room, the search was not an incident of the arrest and therefore was unlawful. Under the circumstances of this case, it was of no significance that the search was before, rather than after, the arrest. (See *People* v. *Simon,* 45 Cal.2d 645, 648 [290 P.2d 531].)

The evidence was sufficient to support a finding that the officers did not obtain the stolen articles by unlawful search and seizure. The court did not err in receiving those articles in evidence.

Appellant contends further that not only the physical objects seized, but also all "other evidence" which proximately results from an unlawful search and seizure are inadmissible. In discussing this contention, appellant refers to various cases and the rulings therein, but he does not specify the "other evidence" to which he refers. Among other things, he states: "The compelling force of the disclosure of the results of the unlawful search and seizure to this youthful appellant at the outset of the conversations evidenced by Dr. Huttenback and Sergeant Stornie cannot be doubted." The statements made hereinabove determining there was no unlawful search or seizure are applicable to this contention.

Appellant also contends that the statements made by him to the master constituted a communication to attorney by means of a necessary intermediary and should not have been received in evidence. In discussing this contention appellant does not specify the statements so referred to. It appears, however, in an earlier part of his brief, there was a statement that his conversation with the master occurred as a part of the transmission of a communication "from client to attorney." Also in that part of his brief, there was a statement that in such conversation, "It was recognized 'by implication' that should arrest be made within a short time of that conversation, defendant might not be able to personally select counsel," and thereafter the master "contacted an attorney, asked him to act for the defendant and related to him what the defendant had said as to the circumstances leading to the search." The evidence was not sufficient to

show that the conversation with the master was a privileged communication within the relationship of attorney and client or at all or that it was intended to be privileged. The evidence shows that the conversation occurred in the presence of Mr. Anderlin, a third person who was not an agent for the purpose of conveying confidential information. The court did not err in receiving the evidence as to the conversation with the master.

Appellant contends further that statements made by him after his arrest in the presence of the arresting officers resulted from their violation of section 849 of the Penal Code. That section provides, in part: "When an arrest is made without a warrant . . . the person arrested . . . must, without unnecessary delay, be taken before the nearest . . . magistrate . . . and a complaint . . . must be laid before such magistrate." Officer Stornie stated that after the arrest they and appellant were at the school from half an hour to an hour, and thereafter they took appellant to the scene of the burglary at the insurance company, for 15 to 20 minutes, before taking him to the jail for booking. Appellant states in his brief that the officer was "vague" as to his estimates of time, and there can be no doubt that substantial time in addition to that spent at the school "was required in the further acts outlined above." The record does not show when appellant was taken before a magistrate. As above stated, appellant did not testify. This contention is not sustainable.

Appellant also contends that the committing magistrate erred in permitting an investigating officer to remain in the courtroom during the preliminary examination, after appellant had made a motion "for an order of exclusion and separation under Sections 867 and 868."

Section 867 provides that the magistrate may exclude all witnesses who have not been examined, and he may cause the witnesses to be kept separate and prevented from conversing with each other until they have testified.

Section 868 provides that the magistrate must, upon request of the defendant, "exclude from the examination every person except his clerk, . . . the prosecutor and his counsel, the Attorney General, the district attorney of the county, the defendant and his counsel, and the officer having the defendant in custody; . . . ."

After appellant counsel made the motion "for an order of exclusion and separation under Sections 867 and 868,"

the magistrate said: "All witnesses will please leave the room except the Witness on the stand and the Investigating Officers—Officer Hovard." Then counsel for appellant said: "Object to his remaining if he is to be a Witness." It appears that the magistrate assumed that counsel for appellant, in making the motion, was referring only to "witnesses" and was not referring to "every person." When the order directed all *witnesses* to leave, except Officer Hovard, the counsel for appellant objected thereto if the officer was to be a *witness*. It would seem that such use of the term "witness" would indicate to the magistrate that the motion pertained to the "witnesses" and not to "every person"; and would indicate that counsel for appellant was not objecting to Officer Hovard remaining if the officer was not to be a witness. Later, the magistrate said to counsel for appellant: "You have no objection to his putting in whatever evidence there is for identification, do you Mr. Abbott?" Then counsel for appellant said: "No, but we are going to object to any evidence after 10:00 A. M. on December 16, 1959, on the ground that any evidence after that time would be under illegal search and seizure." The magistrate said: "I think I will permit Officer Hovard to remain. All other witnesses will please leave the room until called." Since Officer Hovard was not called as a witness, it appears that counsel for appellant made an exception, in his motion, with respect to that officer. Under such circumstances, the magistrate did not err in permitting Officer Hovard to remain in the courtroom.

The evidence was sufficient to support the judgment.

The judgment is affirmed.

Lillie, J., concurred.

A petition for a rehearing was denied October 16, 1961, and appellant's petition for a hearing by the Supreme Court was denied November 15, 1961. Peters, J., was of the opinion that the petition should be granted.