STATE of Utah, Plaintiff and Appellant,

v.

Gregory T. HUNTER, Defendant and Appellee.

No. 910319–CA.

Court of Appeals of Utah.

April 21, 1992.

R. Paul Van Dam and J. Kevin Murphy, Salt Lake City, for plaintiff and appellant.

Ted S. Perry, Logan, for defendant and appellee.

Before GARFF, GREENWOOD and RUSSON, JJ.

RUSSON, Judge:

The State of Utah filed this interlocutory appeal from an order granting defendant Gregory T. Hunter's motion to suppress evidence obtained as a result of a warrantless search of his dormitory room by a Utah State University official. We reverse and remand.

### FACTS

On April 4, 1991, Gregory T. Hunter was charged with theft, a class B misdemeanor, in violation of Utah Code Ann. §§ 76–6–404 and --412(1)(d) (1990),[1] following the seizure of stolen university property from his dormitory room and his subsequent confession to theft of those items.

During the Spring of 1991, Hunter was a student at Utah State University in Logan, Utah and resided in Room 207 of Mountain View Towers, a campus dormitory. All of the students who lived in university-provided housing were required to sign a residence hall contract, which included the following provisions:

13. HOUSING REGULATIONS. Students are required to abide by University and University Housing regulations as outlined in University publications, as well as such rules of conduct as have been adopted by the student organization of the hall in which they reside.... Housing regulations include, but are not limited to, the following:
a) Utah state law prohibits the possession and/or consumption of all alcoholic beverages or the possession of alcoholic beverage containers in the residence halls.

....

e) Firearms and explosives are absolutely prohibited in all residents' rooms/apartments at all times....

15. ENTRY TO STUDENT ROOMS. University officials reserve the right to enter and inspect residence hall rooms at any time. Inspections will occur when necessary to protect and maintain the property of the University, the health and safety of its students, or whenever necessary to aid in the basic responsibility of the University regarding discipline and maintenance of an educational atmosphere. In such cases effort will be made to notify the resident(s) in advance and to have the resident(s) present at the time of entry.

In signing his contract, Hunter acknowledged that he had read and agreed to comply with all of the terms and conditions outlined in the residence hall contract.

In early 1991, numerous incidents of vandalism, damage, and other problems occurred on the second floor of Mountain View Towers, which incidents university officials suspected were the result of violations of the alcohol and explosives prohibitions. In mid-March, university officials met with the residents of that floor. Hunter was present during that meeting, at which the residents were told that if the problems did not cease, room-to-room inspections would be conducted pursuant to the residence hall contracts.

On the morning of April 4, 1991, Gary Smith, Director of Housing and Food Services ·at Utah State University, received a report that further problems and damage had occurred on the second floor of Mountain View Towers. As a result of this report, Smith decided to conduct a room-to-room inspection. Without obtaining a search warrant, Smith began the inspection, accompanied by the head custodian, a football coach, and Officer Steven Milne, a university police officer. The presence of the football coach was requested because a number of football team members lived on the second floor of Mountain View Towers. Officer Milne was called solely for the purpose of providing assistance in the event

---

1. Utah Code Ann. § 76–6–404 (1990) enumerates the elements of theft; Utah Code Ann. § 76–6–412(1)(d) (1990) provides that if the value of the property stolen is $100 or less, then theft of such constitutes a class B misdemeanor.

that Smith discovered any problems that he was not able to handle on his own.

The four men went from room to room, using the following procedure: At each room, Smith knocked on the door, identified himself to the occupant or occupants, and then conducted an inspection of the room. If no occupant was present, Smith admitted himself by using the head custodian's passkey, conducted an inspection, and then exited the room. In the course of the investigation, every room on the floor was inspected.

No one was present in Hunter's room, so Smith used the passkey to gain entry. Upon entering the room, Smith saw stolen university property, consisting of a sign and a banner, in plain view in Hunter's room. At Smith's request, Officer Milne seized these items.

Approximately one hour later, Hunter went to the university police office to complain about the inspection and seizure of the items from his room. At this point, although Hunter was neither under arrest nor in custody, the university police advised Hunter of his *Miranda* rights. Hunter expressly waived his *Miranda* rights and confessed to the theft of the sign and the banner that had been found in his room.

Subsequently, Hunter was charged with theft, a class B misdemeanor. He filed a motion to suppress evidence of the sign and banner found in his room, as well as his confession. The trial court granted the motion, and the State filed this interlocutory appeal, raising the following issue: Did the trial court err in determining that the warrantless entry of Hunter's room, and seizure of property found therein, violated his constitutional protection against unreasonable searches and seizures?[2]

2. The State further argues that even if the warrantless search did violate Hunter's constitutional rights, the trial court nonetheless erred in suppressing Hunter's confession on the basis that, but for the entry and seizure of the property, Hunter would not have confessed to the theft. Because of our resolution of the search issue, we need not address the State's argument on this second issue.

3. *Compare, e.g., Moore v. Student Affairs Comm. of Troy State Univ.*, 284 F.Supp. 725, 729

## STANDARD OF REVIEW

A trial court's findings of fact underlying its decision to grant or deny a motion to suppress must be upheld unless they are clearly erroneous. However, we review the trial court's legal conclusions in regards thereto under a correction of error standard. *State v. Steward*, 806 P.2d 213, 215 (Utah App.1991).

## ANALYSIS

The Fourth Amendment to the United States Constitution protects "the right of the people to be secure in their persons, houses, papers, and effects, against *unreasonable* searches and seizures...." U.S. Const. amend. IV (emphasis added). Thus, the question before us is whether, in light of all of the facts and circumstances, Smith's search of Hunter's room was reasonable.

Since this is an issue of first impression in Utah, we look to other jurisdictions for guidance. Our review of the cases from jurisdictions that have considered this issue reveals a split in authority among the various jurisdictions.[3] Thus, we adopt the more persuasive approach, which holds that in cases such as the one at bar, "[t]he right of privacy protected by the fourth amendment does not include freedom from reasonable inspection of a school-operated dormitory room by school officials." *State v. Kappes*, 26 Ariz.App. 567, 550 P.2d 121, 124 (1976) (citing *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967)).

The court in *Moore v. Student Affairs Comm. of Troy State Univ.*, 284 F.Supp.

(M.D.Ala.1968); *State v. Kappes*, 26 Ariz.App. 567, 550 P.2d 121, 124–25 (1976); *People v. Kelly*, 195 Cal.App.2d 669, 16 Cal.Rptr. 177 (1961); *People v. Haskins*, 48 A.D.2d 480, 369 N.Y.S.2d 869 (1975) *with Piazzola v. Watkins*, 442 F.2d 284 (5th Cir.1971); *Smyth v. Lubbers*, 398 F.Supp. 777 (W.D.Mich.1975); *Morale v. Grigel*, 422 F.Supp. 988 (D.N.H.1976); *People v. Cohen*, 57 Misc.2d 366, 292 N.Y.S.2d 706 (1968).

725 (M.D.Ala.1968), outlined the reasoning for adopting such an approach:

> College students who reside in dormitories have a special relationship with the college involved. Insofar as the Fourth Amendment affects that relationship, it does not depend on either a general theory of the right of privacy or on traditional property concepts. The college does not stand, strictly speaking, *in loco parentis* to its students, nor is their relationship purely contractual in the traditional sense. The relationship grows out of the peculiar and sometimes the seemingly competing interests of college and student. A student naturally has the right to be free of unreasonable search and seizures, and a tax-supported public college may not compel a "waiver" of that right as a precedent to admission. The college, on the other hand, has an "affirmative obligation" to promulgate and enforce reasonable regulations designed to protect campus order and discipline and to promote an environment consistent with the educational process. The validity of the regulation authorizing search of dormitories thus does not depend on whether a student "waives" his right to Fourth Amendment protection or on whether he has "contracted" it away; rather, its validity is determined by whether the regulation is a reasonable exercise of the college's supervisory duty. In other words, if the regulation— or, in the absence of a regulation, the action of the college authorities—is necessary in aid of the basic responsibility of the institution regarding discipline and maintenance of an "educational atmosphere," then it will be presumed facially reasonable despite the fact that it may infringe to some extent on the outer bounds of the Fourth Amendment rights of students.

*Id.* at 729 (footnotes omitted). Thus, the *Moore* court concluded that the search was reasonable, likening it to a number of Supreme Court cases in which searches had been found to be permissible because they were "conducted by a superior charged with a responsibility of maintaining discipline and order or of maintaining security."

*Id.* at 730–31 (citing *United States v. Grisby*, 335 F.2d 652 (4th Cir.1964); *United States v. Collins*, 349 F.2d 863, 868 (2d Cir.1965); *United States v. Donato*, 269 F.Supp. 921 (E.D.Pa.1967), aff'd, 379 F.2d 288 (3d Cir.1967); *United States v. Miller*, 261 F.Supp. 442, 449 (D.Del.1966)).

Similarly, the Supreme Court has recognized that "where state-operated educational institutions are involved, . . . [there is a] 'need for affirming the comprehensive authority of the States and of school officials, consistent with fundamental constitutional safeguards, to prescribe and control conduct in the schools.'" *Healy v. James*, 408 U.S. 169, 180, 92 S.Ct. 2338, 2345–46, 33 L.Ed.2d 266 (1972) (quoting *Tinker v. Des Moines Indep. Community Sch. Dist.*, 393 U.S. 503, 507, 89 S.Ct. 733, 737, 21 L.Ed.2d 731 (1969)). Furthermore, even cases in those jurisdictions that have held that such searches are illegal acknowledge that universities have an interest in regulating student conduct. *See, e.g., Piazzola v. Watkins*, 442 F.2d 284, 289 (5th Cir.1971) (universities retain broad supervisory powers to permit them to adopt such regulations, so long as the regulation is reasonably construed and limited in its application); *Morale v. Grigel*, 422 F.Supp. 988, 997 (D.N.H.1976) (schools have a legitimate interest in preventing disruption on campus, as long as its interests are limited by its function as an educational institution).

Applying this law to the facts of our case, we conclude that Smith's search was a reasonable exercise of the university's authority to maintain an educational environment. Students attending a university require and are entitled to an atmosphere that is conducive to educational pursuits. In a dormitory situation, it is the university that accepts the responsibility of providing this atmosphere. Thus, it is incumbent upon the university to take whatever reasonable measures are necessary to provide a clean, safe, well-disciplined environment in its dormitories. Due to numerous incidents of vandalism, damage, and other problems occurring on the second floor of Mountain View Towers, which incidents were suspected to be the result of viola-

tions of the alcohol and explosives prohibitions, university officials had an interest in correcting the same in order to maintain a proper educational environment. *See Kappes,* 550 P.2d at 124.

Moreover, the housing contract between Hunter and Utah State University offers further support for the determination that the search was reasonable. As part of Hunter's agreement to live in university-provided housing, he was required to sign a residence hall contract, the provisions of which included a prohibition against the possession or consumption of alcoholic beverages or the possession of alcoholic beverage containers in residence halls and a prohibition against the possession of explosives in all residents' rooms at all times. In order to enforce these regulations, university officials reserved the right to enter and inspect residence hall rooms at any time "to protect and maintain the property of the University, the health and safety of its students, or whenever necessary to aid in the basic responsibility of the University regarding discipline and maintenance of an educational atmosphere." By signing the aforementioned housing contract, Hunter agreed to the university's right of reasonable inspection and waived any Fourth Amendment objections to the university's exercise of that right. Thus, given the fact that Hunter acknowledged the university's right to inspect his room when he signed his housing contract, and accepted the room on that condition, it can hardly be said that the stolen university property seized in plain view had been the subject of an unreasonable search. *See Moore,* 284 F.Supp. at 729–31; *Kappes,* 550 P.2d at 124.

In fact, not only did university officials have a right to maintain an educational atmosphere, they had a contractual *duty* to do so. Paragraph 21 of the housing agreement provides the basis of such duty:

21. AGREEMENT TO STUDENTS. For those students who remain current on their financial accounts and who abide by the above stated Terms and Conditions of Occupancy, Utah State University Housing agrees to provide an environment which is clean, safe, well maintained, and to promote an atmosphere which is conducive to study and free of undue disturbances.

Further support for the reasonableness of the search is found in the fact that effort was made to notify the residents in advance of the possibility of university officials pursuing such a remedy. In mid-March, university officials met with the residents of Hunter's floor, at which time the residents were told that if the problems did not cease, room-to-room inspections would be conducted pursuant to the residence hall contract. Hunter was present during that meeting. It is clear that, under the facts of this case, such notice was sufficient to alert residents of the imminent possibility that such a search would be undertaken. Additionally, since the search was conducted in mid-morning and Smith knocked on each door before entering, we cannot say that the search was overly intrusive under the circumstances of this case. Also, the fact that further problems and damage were reported on the very morning of the room-to-room search supports the conclusion that Smith's decision to search was reasonable.

Lastly, it is important to distinguish what did not occur: This is not a case in which university officials took action at the behest of or as part of a joint investigation with the police. *Compare Piazzola,* 442 F.2d at 286; *Moore,* 284 F.Supp. at 727–28; *People v. Kelly,* 195 Cal.App.2d 669, 16 Cal.Rptr. 177 (1961); *People v. Cohen,* 57 Misc.2d 366, 292 N.Y.S.2d 706 (1968); *Commonwealth v. McCloskey,* 217 Pa.Super. 432, 272 A.2d 271 (1970). Nor did university officials attempt to delegate their right to inspect rooms to the police, which would result in the circumvention of traditional restrictions on police activity. *Compare Piazzola,* 442 F.2d at 286; *Moore,* 284 F.Supp. at 728; *Kelly,* 16 Cal.Rptr. at 179; *McCloskey,* 272 A.2d at 272. In light of the recurring troubles with vandalism and other damage that had occurred on Hunter's floor, Smith alone made the decision to conduct a room-to-room search for university purposes, without any input from the university police. The sole purpose of Offi-

cer Milne's presence was to provide assistance in the event that Smith confronted problems he was not able to handle on his own. Thus, no action was taken which would promote circumvention of constitutional restrictions placed on police action.

### CONCLUSION

The search undertaken to protect the university's interest in maintaining a safe and proper educational environment, as well as to fulfill the requirements of the housing contract, was reasonable. Accordingly, we reverse the trial court's determination that evidence of the stolen property found in Hunter's room should be suppressed. Additionally, since the trial court's sole ground in suppressing Hunter's confession is based on its erroneous determination that the stolen property should be suppressed, that determination is also reversed. This matter is remanded to the trial court for further proceedings consistent with this opinion.

GARFF and GREENWOOD, JJ., concur.