[No. H029017. Sixth Dist. Oct. 11, 2006.]

THE PEOPLE, Petitioner, v.
THE SUPERIOR COURT OF SANTA CLARA COUNTY, Respondent;
CHRISTOPHER EUGENE WALKER, Real Party in Interest.

COUNSEL

George W. Kennedy, District Attorney, Neal J. Kimball, Joyce Ferris-Metcalf and Kaci R. Lopez, Deputy District Attorneys, for Petitioner.

No appearance for Respondent.

Law Office of John A. W. Halley and John A. W. Halley for Real Party In Interest.

OPINION

DUFFY, J.—A 19-year-old college student, defendant and real party in interest Christopher Eugene Walker (defendant), was charged with possession of marijuana for sale. (Health & Saf. Code, § 11359.) Critical evidence supporting that charge was obtained from defendant's dormitory room at Santa Clara University (University) as a result of a warrantless search and seizure by police officers of the City of Santa Clara.

Defendant brought a motion to suppress evidence pursuant to Penal Code section 1538.5.[1] He contended that evidence supporting the charge against him—i.e., marijuana, a digital scale, and $1,800 cash (collectively, the contraband[2])—was illegally seized by the police. After an evidentiary hearing, submission of supplemental briefing, and a further hearing, the superior court granted defendant's motion to suppress. In so ruling, the court rejected the People's contention that the search and seizure of the contraband was reasonable because a University security officer—who had the lawful right to be present in defendant's dormitory room—had given consent for the police to enter the room.

The People filed a statutory petition for writ of mandate challenging the suppression order, pursuant to section 1538.5, subdivision (o). For the reasons discussed below, we conclude that the University security officer did not have actual authority to consent to the search; on this basis, we therefore do not

---

[1] All further statutory references are to the Penal Code unless otherwise stated.

[2] We use this word advisedly as a term of convenience to describe collectively the marijuana and the evidence relating to its possible possession for sale. In so doing, we acknowledge that the term "contraband" usually has a more restricted meaning. (See *Guidi v. Superior Court* (1973) 10 Cal.3d 1, 12, fn. 10 [109 Cal.Rptr. 684, 513 P.2d 908]: "Proper usage [of the term 'contraband'] would appear to convey the sense of property which can *only* be unlawfully possessed.")

deem the warrantless police entry into defendant's dormitory room to have been reasonable. The People also contend that the search was reasonable based upon a third party's apparent authority to consent, i.e., it was reasonable for the police to believe that the security officer could consent to the search. While we acknowledge that this position may have some validity, we need not resolve the question, in light of our holding that the suppression motion should have been denied on another basis; the seized contraband was not subject to the exclusionary rule because the contraband would have been inevitably discovered. Accordingly, we will grant the People's petition for writ of mandate.

## PROCEDURAL HISTORY

Defendant was charged with possession of marijuana for sale. (Health & Saf. Code, § 11359.)[3] After a preliminary hearing, he was held to answer.

Defendant thereafter filed a motion to suppress evidence pursuant to section 1538.5. He sought suppression of "any physical evidence, any statements, and any observations that were obtained, as a result of or after any officers or campus security officers made any entry into or observations into" his dormitory room. Defendant argued that the entry into and observations made of his room were the product of a warrantless and unreasonable search or seizure.

The People filed written opposition to the motion, and the court conducted an evidentiary hearing.[4] After receiving supplemental briefs, and after hearing further argument, the court granted the motion to suppress the contraband seized by the Santa Clara police.

On July 6, 2005, the People filed their petition for writ of mandate with this court, pursuant to section 1538.5, subdivision (o). Because we concluded that the petition presented close and important questions of constitutional law, we issued an order directing the superior court to show cause why a peremptory writ of mandate should not issue as prayed in the People's petition. That order established a briefing schedule for the filing by defendant of a return in opposition and any reply by the People.

---

[3] "Every person who possesses for sale any marijuana, except as otherwise provided by law, shall be punished by imprisonment in the state prison." (Health & Saf. Code, § 11359.)

[4] The evidence relevant to the suppression motion is set forth at length, *post.*

## RELEVANT FACTS

### I. *Stipulated Testimony of University Safety Officer Kim Payne*

At the hearing on defendant's motion to suppress on May 24, 2005, the parties stipulated that Kim Payne (Payne), a University safety officer, would have testified (had he been sworn) as follows:[5]

"On October 15, 2004, about 6:30 p.m., Santa Clara University Campus Safety Service Officer Kim Payne was conducting routine bicycle patrol of the campus. He observed the defendant smoking marijuana outside Sobrato Hall. As the defendant was walking with two other students, Mr. Payne watched defendant light what appeared to be a 'blunt' (a small cigar stuffed with marijuana). As Mr. Payne turned towards the group, the defendant tried to hide the blunt in his right hand as one of the other students moved in front of him. Mr. Payne smelled the odor of marijuana. He stopped the three students and asked them for their access cards. . . .

"Mr. Payne then asked the defendant what he was smoking. The defendant stated that it was a blunt, saying it was the only one he had, but that he had more marijuana in his room for medical use. He spontaneously said that Mr. Payne could come up to his room and invited him to look at the marijuana and his medical marijuana card. He then showed Mr. Payne two cannabis club cards, which he said that he had used to legally purchase the marijuana. When asked if the Dean of Student Life was aware of his marijuana use and needs, the defendant stated that he had not notified the University. He then gave the blunt to Mr. Payne when requested to do so.

"After Mr. Payne had informed the defendant that he would meet him at his room, they met at the east entrance to Graham Hall 100. Mr. Payne used his access card to gain entry into the building. The defendant unlocked his room door with his own key and escorted Mr. Payne inside. The defendant then removed a sandwich size plastic bag of marijuana from the drawers in

---

[5] The parties stipulated at the hearing that matters "as cited in the motion with regard to the activities of the [U]niversity security guard" would have been presented through that witness's testimony. But it is plain that the reference in the transcript was to the People's opposition, since defendant's motion contained no such matters. Additionally, at oral argument, defendant's attorney maintained (incorrectly) that the only evidence before the trial court was the stipulated testimony of Santa Clara Police Officer Tyson Green (discussed, *post*). At the hearing on the motion, however, after the court announced its understanding that the parties had stipulated to the matters "as cited in the motion" concerning the safety officer's activities, defense counsel advised that the court's understanding was correct: "Yes, Your Honor. But I want to be careful with this, that I would stipulate that that's what the security officer would testify to." Clearly, the evidence before the court on which the motion was decided included Payne's stipulated testimony.

the closet. He stated that he had purchased this marijuana from a cannabis club in Oakland, showing Mr. Payne a medical release form that purported to authorize his use of marijuana for therapeutic use. Mr. Payne observed a knife, a pair of scissors, four miniature cigars and a small electronic scale on the desk near the doorway.

"The defendant was acting rather suspiciously as he stood near the closet drawers. When asked if there was any more marijuana in the room, he stated that there was not, and if there were more marijuana in the room, he would know about it. Mr. Payne then checked the top drawer in the closet and noticed an open box of snack size plastic bags, a plastic bag of several disassembled cigars, and several snack size plastic bags with marijuana remnants inside. The bottom right drawer contained a white and red Igloo cooler with two sandwich sized bags full of marijuana. In the second drawer a wad of cash containing $1,800 was located. Walker claimed that he had won the money while playing cards. [¶] . . . [¶]

"After the arrival of the two Santa Clara Police Department Officers, Mr. Payne continued to search and found a jar containing two more sandwich size bags full of marijuana beneath a bunch of dirty clothes in the closet. Two additional boxes of unused sandwich size plastic bags were also found in the room.

"All evidence items located there and the photos of them were given to [Police] Office Green, who later booked them into evidence at the Santa Clara Police Department. Exhibit 2. The defendant stated spontaneously that these items belonged to him and not to his roommate."

## II. Stipulated Testimony of Police Officer Tyson Green

The parties agreed further at the hearing on the motion to suppress that Officer Tyson Green of the Santa Clara Police Department would have testified as follows:

"The Santa Clara Police Department was contacted by the University Campus Safety Office, and they were told that a considerable amount of drugs had been found in a Residence Hall room. As a result, Officers Green and Lamendola went to that [U]niversity Residence Hall at about 7:04 p.m. [on October 15, 2004], and they met in the first floor hallway with Santa Clara University campus safety officer Michael Brady.

"[Brady's] partner, Kim Payne . . . was still inside the room with the defendant. Mr. Brady said to the [police] officers, 'You've got to see this.' And he swung open the door inwardly to room 104[,] which is the defendant's residence room.

"At that point, the Santa Clara [police] officers were standing in the hallway next to the defendant's dormitory room. And while standing in the hallway after the door was swung open, from a distance of approximately five feet, the officers were able to observe a large quantity of what they knew to be marijuana in plastic baggies and cash on the desk just inside room 104. The marijuana was in plain view and openly visible to any persons that walked the hallway.

"The [police] officers stood there for a few moments until [Mr.] Payne and the defendant were standing near the doorway and they asked [Mr.] Payne if he had received consent to search the room. Mr. Payne told him that he had received consent but that it wasn't necessary because of the waiver the defendant had signed in his Residence Housing Contract. Both officers then entered the room."

### III. *University Housing Contract*

In addition to the stipulated testimony of Payne and Officer Green, the housing agreement between the University and the defendant (Housing Contract) was before the court.[6] The "Terms and Conditions of Occupancy" appended to the contract provided in relevant part: "Room entry and inspection may occur periodically. The University balances the right to privacy of the resident students with the responsibility to maintain a safe environment for all students and staff in the residence halls. The University will take all reasonable steps to ensure the residents of a room receive reasonable notice prior to entry by University personnel for the purposes of repair, inventory, construction, and/or inspection. The University also reserves the right to enter a residence room without notice for responding to real or reasonably perceived emergencies, . . . and/or for response to situations where there is a reasonable suspicion that a violation of the law or University policies is occurring or has occurred inside a particular room. Under such circumstances,

---

[6] Defendant has objected to the People's reference to the Housing Contract in this writ proceeding. The Housing Contract was referred to and quoted at length in the People's opposition to the motion to suppress; was alluded to during the evidentiary hearing (in the stipulated testimony of Officer Green); was referenced again in, and was attached as, an exhibit to the People's supplemental brief filed below; and was referred to by the court and the People during the second hearing on the motion. At no time did defendant object below to the Housing Contract. Under the circumstances, and given the fact that the court below considered the Housing Contract (and referred to it in its order), we conclude that defendant has forfeited any objection to its introduction. (See *People v. Williams* (1999) 20 Cal.4th 119, 136 [83 Cal.Rptr.2d 275, 973 P.2d 52] [a defendant moving to suppress evidence due to warrantless search, after prosecution presents some justification for search or seizure, must give prosecution sufficient notice of claimed inadequacy of justification to preserve that claim on appeal]; cf. *Miller v. Superior Court* (2002) 101 Cal.App.4th 728, 742 [124 Cal.Rptr.2d 591] [failure to object to evidence at hearing on criminal defendant's motion to dismiss pursuant to section 995 constituted forfeiture of issue on appeal under Evid. Code, § 353, subd. (a)].)

it is not necessary that the room's resident(s) be present; nor will a resident's refusal, either verbal or physical, prevent an entry or inspection. By entering into the University Residence Hall Contract . . . the student consents to the room entry and inspection under those circumstances indicated." The appendix to the agreement provided further that "[r]esidents agree to abide by all applicable laws and University regulations. . . . Students who fail to abide by this agreement will be subject to University disciplinary procedures as well as possible termination of their University Residence Hall Contract." Included among specified acts subjecting the resident student to disciplinary action is the "[v]iolation of state laws regarding possession and/or consumption of controlled substances."

## DISCUSSION

### I. *Contentions*

The People contend that the court erred in suppressing the contraband for essentially four reasons:

1. The police officers' entry into defendant's dormitory room was lawful because they had valid third party consent (from Payne); under the circumstances, the officers' conduct was justified because Payne had either actual or apparent authority to consent to the entry.

2. Because the contraband was in plain view from the hallway, the police officers' entry into the room and seizure of the contraband were justified.

3. The police officers' entry into the room was justified under the "consent-once-removed" doctrine.[7]

4. Even if the police officers' entry into the dorm room was unlawful, the seized contraband that would have otherwise been subject to the exclusionary rule was admissible under the inevitable discovery rule.

We will first delineate our standard of review and identify general principles of search and seizure law before addressing the People's contentions.

---

[7] Citing primarily *Toubus v. Superior Court* (1981) 114 Cal.App.3d 378 [170 Cal.Rptr. 697], the People argue that, since defendant consented to Payne's entry into the dorm room and Payne thereafter developed probable cause to arrest defendant (putting aside the fact that Payne was not a peace officer), the officers' entry was lawful. Defendant maintains that the People failed to make this argument below, and that because they did not timely assert it, they forfeited the contention. (See *People v. Williams, supra,* 20 Cal.4th at p. 136; *People v. Miller* (1972) 7 Cal.3d 219, 227 [101 Cal.Rptr. 860, 496 P.2d 1228].) For reasons discussed, *post,* however, we find it unnecessary to address either the merits of this "consent-once-removed" argument or its possible forfeiture.

## II. Standard of Review

Our Supreme Court has explained the trial court's role in deciding motions to suppress brought under section 1538.5 and appellate review of those decisions as follows: "In ruling on such a motion, the trial court (1) finds the historical facts, (2) selects the applicable rule of law, and (3) applies the latter to the former to determine whether the rule of law as applied to the established facts is or is not violated. [Citations.] 'The [trial] court's resolution of each of these inquiries is, of course, subject to appellate review.' [Citations.] [¶] The court's resolution of the first inquiry, which involves questions of fact, is reviewed under the deferential substantial-evidence standard. [Citations.] Its decision on the second, which is a pure question of law, is scrutinized under the standard of independent review. [Citations.] Finally, its ruling on the third, which is a mixed fact-law question that is however predominantly one of law, viz., the reasonableness of the challenged police conduct, is also subject to independent review. [Citations.]" (*People v. Williams* (1988) 45 Cal.3d 1268, 1301 [248 Cal.Rptr. 834, 756 P.2d 221]; see also *People v. Alvarez* (1996) 14 Cal.4th 155, 182 [58 Cal.Rptr.2d 385, 926 P.2d 365].)

Since the trial court here decided the motion based on stipulated testimony, all aspects of the trial court's ruling are subject to this court's independent review. (*People v. Thompson* (2006) 38 Cal.4th 811, 818 [43 Cal.Rptr.3d 750, 135 P.3d 3]; see also *People v. Jenkins* (2000) 22 Cal.4th 900, 969 [95 Cal.Rptr.2d 377, 997 P.2d 1044] [appellate court, in reviewing ruling on motion to suppress, "independently review[s] the trial court's application of the law to the facts"].) Further, we examine the legal issues surrounding the potential suppression of evidence derived from a police search and seizure by applying federal constitutional standards. (*People v. Robles* (2000) 23 Cal.4th 789, 794 [97 Cal.Rptr.2d 914, 3 P.3d 311].)

We review the court's order granting defendant's section 1538.5 motion to suppress with the above standard of review in mind.

## III. Search and Seizure Principles

The Fourth Amendment to the Constitution of the United States provides: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." Our state Constitution provides for similar safeguards against unreasonable searches and seizures. (Cal. Const., art. I, § 13.) As the Supreme Court has explained: "The touchstone of the Fourth

Amendment is reasonableness. [Citation.] The Fourth Amendment does not proscribe all state-initiated searches and seizures; it merely proscribes those which are unreasonable." (*Florida v. Jimeno* (1991) 500 U.S. 248, 250 [114 L.Ed.2d 297, 111 S.Ct. 1801]; see also *Brigham City, Utah v. Stuart* (2006) 547 U.S. ___ [164 L.Ed.2d 650, 126 S.Ct. 1943, 1947].)

■ "[T]he Fourth Amendment protects people, not places." (*Katz v. United States* (1967) 389 U.S. 347, 351 [19 L.Ed.2d 576, 88 S.Ct. 507].) A Fourth Amendment claim " 'may not be vicariously asserted.' [Citations.]" (*Rakas v. Illinois* (1978) 439 U.S. 128, 133–134 [58 L.Ed.2d 387, 99 S.Ct. 421].) "[I]n order to claim the protection of the Fourth Amendment, a defendant must demonstrate that he personally has an expectation of privacy in the place searched, and that his expectation is reasonable." (*Minnesota v. Carter* (1998) 525 U.S. 83, 88 [142 L.Ed.2d 373, 119 S.Ct. 469]; see, e.g., *Minnesota v. Olson* (1990) 495 U.S. 91, 99 [109 L.Ed.2d 85, 110 S.Ct. 1684] [houseguest has legitimate expectation of privacy in host's home].) The defendant thus bears the burden "of establishing a legitimate expectation of privacy in the place searched or the thing seized. [Citations.]" (*People v. Jenkins, supra*, 22 Cal.4th at p. 972; see also *People v. McPeters* (1992) 2 Cal.4th 1148, 1171 [9 Cal.Rptr.2d 834, 832 P.2d 146].) And "[t]he Fourth Amendment's protection against unreasonable searches and seizures applies only to governmental action. [Citation.]" (*In re William G.* (1985) 40 Cal.3d 550, 558 [221 Cal.Rptr. 118, 709 P.2d 1287], citing *Coolidge v. New Hampshire* (1971) 403 U.S. 443, 487 [29 L.Ed.2d 564, 91 S.Ct. 2022] (*Coolidge*).)

■ " '[P]rivate residences are places in which the individual normally expects privacy free of governmental intrusion not authorized by a warrant, and that expectation is plainly one that society is prepared to recognize as justifiable.' [Citations.]" (*People v. Robles, supra*, 23 Cal.4th at p. 795, quoting *United States v. Karo* (1984) 468 U.S. 705, 714 [82 L.Ed.2d 530, 104 S.Ct. 3296].) Therefore, searches and seizures conducted without a warrant "are *per se* unreasonable under the Fourth Amendment [of the United States Constitution]—subject only to a few specifically established and well-delineated exceptions." (*Katz v. United States, supra*, 389 U.S. at p. 357, fns. omitted; see also *Payton v. New York* (1980) 445 U.S. 573, 586 [63 L.Ed.2d 639, 100 S.Ct. 1371]; *People v. Thompson, supra*, 38 Cal.4th at pp. 817–818.) Where the defendant establishes that the search or seizure was made without a warrant, and was prima facie unlawful, "the burden then rest[s] on the prosecution to show proper justification. [Citation.]" (*Horack v. Superior Court* (1970) 3 Cal.3d 720, 725 [91 Cal.Rptr. 569, 478 P.2d 1]; see also *People v. Jenkins, supra*, 22 Cal.4th at p. 972.)

█ That the police may have probable cause for their belief that items are subject to seizure does not eliminate the need for a warrant to effect a search of a residence. (*Jones v. United States* (1958) 357 U.S. 493, 497 [2 L.Ed.2d 1514, 78 S.Ct. 1253].) "Were federal officers free to search without a warrant merely upon probable cause to believe that certain articles were within a home, the provisions of the Fourth Amendment would become empty phrases, and the protection it affords largely nullified." (*Id.* at p. 498.) As our nation's high court also explained over 50 years ago: "The point of the Fourth Amendment . . . is not that it denies law enforcement the support of the usual inferences which reasonable men draw from evidence. Its protection consists in requiring that those inferences be drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime. Any assumption that evidence sufficient to support a magistrate's disinterested determination to issue a search warrant will justify the officers in making a search without a warrant would reduce the Amendment to a nullity and leave the people's homes secure only in the discretion of police officers. Crime, even in the privacy of one's own quarters, is, of course, of grave concern to society, and the law allows such crime to be reached on proper showing. The right of officers to thrust themselves into a home is also a grave concern, not only to the individual but to a society which chooses to dwell in reasonable security and freedom from surveillance. When the right of privacy must reasonably yield to the right of search is, as a rule, to be decided by a judicial officer, not by a policeman or government enforcement agent." (*Johnson v. United States* (1948) 333 U.S. 10, 13–14 [92 L.Ed. 436, 68 S.Ct. 367], fns. omitted.)

The reason for this presumption that warrantless searches are unreasonable (and hence illegal) is plain: "An intrusion by the state into the privacy of the home for any purpose is one of the most awesome incursions of police power into the life of the individual. . . . It is essential that the dispassionate judgment of a magistrate, an official dissociated from the 'competitive enterprise of ferreting out crime' [citation], be interposed between the state and the citizen at this critical juncture." (*People v. Ramey* (1976) 16 Cal.3d 263, 275 [127 Cal.Rptr. 629, 545 P.2d 1333].)

█ And the warrant requirement cannot be forfeited for the sake of the efficiency of law enforcement. "[T]he inconvenience to the officers and some slight delay necessary to prepare papers and present the evidence to a magistrate . . . are never very convincing reasons . . . to by-pass the constitutional requirement" of a warrant. (*Johnson v. United States, supra,* 333 U.S. at p. 15; see also *Mincey v. Arizona* (1978) 437 U.S. 385, 393 [57 L.Ed.2d 290, 98 S.Ct. 2408] [person's privacy rights in "home and property may not be totally sacrificed in the name of maximum simplicity in enforcement of the criminal law"]; *Coolidge, supra,* 403 U.S. at p. 481

[warrant requirement is valued part of constitutional law and "not an inconvenience to be somehow 'weighed' against the claims of police efficiency"].)

■ Thus, "the Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant." (*Payton v. New York, supra,* 445 U.S. at p. 590; see also *Johnson v. United States, supra,* 333 U.S. at pp. 14–15 [warrant required save in cases involving "exceptional circumstances"]; *People v. Ramey, supra,* 16 Cal.3d at p. 270 [warrantless searches "unreasonable per se in the absence of one of a small number of carefully circumscribed exceptions"].)

IV. *Third Party Consent to Search and Seizure*

The People contend that the police officers had valid third party consent to enter defendant's dormitory room because University employee Payne had actual authority to consent to the police officers' entry into the room. In the alternative, the search and seizure of the contraband were reasonable because the police officers reasonably believed that Payne had authority to consent to their entry. Although we will conclude that the motion to suppress should have been denied on another ground—i.e., the contraband would have been inevitably discovered and thus the exclusionary rule should not apply—we address this third-party-consent issue because we deem it to be one of considerable constitutional significance. Before doing so, however, we will first identify the relevant legal authority concerning (1) the third-party-consent exception to the general proscription against warrantless searches and seizures, and (2) the validity of warrantless searches of college and university dormitory rooms.

A. *Nature of Doctrine*

■ A recognized exception to the Fourth Amendment's proscription against warrantless searches is a search that is based upon consent. (*Schneckloth v. Bustamonte* (1973) 412 U.S. 218, 219 [36 L.Ed.2d 854, 93 S.Ct. 2041].) That consent may be given by the party later challenging the search's constitutional validity. (*Ibid.*) Alternatively, "a third party who possesses common authority over the premises" may consent to the search. (*Illinois v. Rodriguez* (1990) 497 U.S. 177, 181 [111 L.Ed.2d 148, 110 S.Ct. 2793] (*Rodriguez*); see also *People v. Boyer* (2006) 38 Cal.4th 412, 445 [42 Cal.Rptr.3d 677, 133 P.3d 581] [search without warrant may "be based on the consent of a person, other than the accused, who has joint dominion or control over the area or thing to be searched"].)

■ The validity of a third party's consent to search is founded upon the nature and extent of that party's access to and control over the property. As the United States Supreme Court has explained: "The [common] authority which justifies the third-party consent does not rest upon the law of property, with its attendant historical and legal refinements [citations] but rests rather on mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched." (*United States v. Matlock* (1974) 415 U.S. 164, 171, fn. 7 [39 L.Ed.2d 242, 94 S.Ct. 988] (*Matlock*).) Third party consent is valid where it is given by one "who possess[es] common authority over or other sufficient relationship to the premises or effects sought to be inspected." (*Id.* at p. 171, fn. omitted; see also *People v. Bishop* (1996) 44 Cal.App.4th 220, 237 [51 Cal.Rptr.2d 629] [co-occupants of property having joint access or control assume risk that one co-occupant may permit police search of such property].)[8]

■ The law also permits a search based upon consent by a person with apparent authority where the officers conducting the search reasonably believe that the person is empowered to give that consent. In *Rodriguez, supra*, 497 U.S. at p. 186, the Supreme Court held that where the police conduct a warrantless search based upon the consent of a third party whom they reasonably believe at the time to have the authority to give it, no Fourth Amendment violation occurs. The high court reasoned: "It is apparent that in order to satisfy the 'reasonableness' requirement of the Fourth Amendment, what is generally demanded of the many factual determinations that must regularly be made by agents of the government—whether the magistrate issuing a warrant, the police officer executing a warrant, or the police officer conducting a search or seizure under one of the exceptions to the warrant requirement—is not that they always be correct, but that they always be reasonable." (*Rodriguez*, at p. 185; see also *People v. Jenkins, supra*, 22 Cal.4th at pp. 972–980 [officers had reasonable basis for believing that the defendant's sister, who had possession of his unlocked briefcase, could consent to search of its contents].) The prosecution bears the burden of proof in showing the reasonableness of the officer's belief in the apparent authority of the third party giving consent. (*People v. Jenkins, supra*, at p. 972.)

---

[8] But see *Georgia v. Randolph* (2006) 547 U.S. 103 [164 L.Ed.2d 208, 126 S.Ct. 1515], in which the Supreme Court recently held that the warrantless search of a home based upon the consent of one co-occupant (the defendant's estranged wife) was invalid as to the defendant, where the defendant (the other co-occupant) was present and expressly refused to allow police entry.

■ Thus, the owners of property may consent to a police search thereof as long as no other persons are legitimately occupying that property. (*People v. Carr* (1972) 8 Cal.3d 287, 298 [104 Cal.Rptr. 705, 502 P.2d 513].) Likewise, a co-occupant—i.e., "one who possesses common authority over premises" (*Matlock, supra*, 415 U.S. at p. 170)—may give valid consent to a search of the premises "as against the absent, nonconsenting person with whom that authority is shared." (*Ibid.*; see also *Frazier v. Cupp* (1969) 394 U.S. 731, 740 [22 L.Ed.2d 684, 89 S.Ct. 1420] [cousin had authority to consent to search of the defendant's duffel bag which both men used and which had been left with cousin].) For example, the co-occupant may be the defendant's spouse (*Coolidge, supra*, 403 U.S. at pp. 488–489), the defendant's lover posing as his wife (*Matlock, supra*, at p. 176), or the defendant's mistress (*People v. Smith* (1966) 63 Cal.2d 779, 799 [48 Cal.Rptr. 382, 409 P.2d 222]). And a host may give valid third party consent to search her home where that search reveals evidence that inculpates her transient guest. (*People v. Welch* (1999) 20 Cal.4th 701, 747–748 [85 Cal.Rptr.2d 203, 976 P.2d 754].)

■ But a landlord may not give valid third party consent to a police search of a house rented to another. (*Chapman v. United States* (1961) 365 U.S. 610, 616–618 [5 L.Ed.2d 828, 81 S.Ct. 776] (*Chapman*); *People v. Escudero* (1979) 23 Cal.3d 800, 807 [153 Cal.Rptr. 825, 592 P.2d 312].) The same principle applies to prevent a finding of third party consent where the leased property is an apartment unit (*People v. Roberts* (1956) 47 Cal.2d 374, 377 [303 P.2d 721]), a room in a boarding house (*McDonald v. United States* (1948) 335 U.S. 451 [93 L.Ed. 153, 69 S.Ct. 191]), a garage (*People v. Roman* (1991) 227 Cal.App.3d 674, 680 [278 Cal.Rptr. 44]), or a locker (*People v. Baker* (1970) 12 Cal.App.3d 826, 836 [96 Cal.Rptr. 760]). Likewise, a hotel clerk may not consent to the search of an occupant's room. (*Stoner v. California* (1964) 376 U.S. 483, 488–489 [11 L.Ed.2d 856, 84 S.Ct. 889] (*Stoner*); *People v. Burke* (1962) 208 Cal.App.2d 149, 160 [24 Cal.Rptr. 912]; see also *People v. Bennett* (1998) 17 Cal.4th 373, 384 [70 Cal.Rptr.2d 850, 949 P.2d 947] [motel].)

## B. *Searches of College or University Dormitory Rooms*

There are surprisingly few cases addressing the constitutional validity of searches of college[9] dormitory rooms. (See generally Annot., Search Conducted by School Official or Teacher as Violation of Fourth Amendment or Equivalent State Constitutional Provision (1995) 31 A.L.R.5th 229, 296–300, § 8 and cases cited.)[10] Only one case was decided in California.

---

[9] Throughout this discussion of dormitory searches, we use the term "college" for convenience to refer to both college and university settings.

[10] Our research has disclosed some 29 cases, fewer than half of which were decided in the last two decades.

(See *People v. Kelly* (1961) 195 Cal.App.2d 669 [16 Cal.Rptr. 177] (*Kelly*).) Many of the cases have involved the legality of searches by college officials only, and have not addressed whether police searches abridged the Fourth Amendment rights of dormitory room occupants. We first discuss *Kelly*—a case relied on by the People in the writ petition[11]—and then discuss several out-of-state cases concerning dormitory room searches.[12]

### 1. People v. Kelly

In *Kelly, supra,* 195 Cal.App.2d 669, the defendant (a college student attending California Institute of Technology) contended that his conviction of two counts of burglary was based upon evidence illegally seized from his dormitory room. (*Id.* at p. 671.) After the police obtained information concerning several burglaries that led them to suspect the defendant, they contacted the college dean, who in turn contacted the house master, who had general responsibility over all resident students at the college. (*Id.* at pp. 672–673.) The house master advised the police that he had "free inspection rights to all rooms" and was specifically authorized under the housing rules to use his master key to enter any of the rooms in case of emergency. (*Id.* at p. 673.) The police then accompanied the house master to the defendant's room. (*Ibid.*) As they approached the room, the door was open at an angle of approximately 35 degrees. (*Ibid.*) The house master opened the door further as he went into the room; an officer then entered the room, found no one present, and searched for the defendant under the bed and in the closet. (*Id.* at pp. 673–674.) The police officer located one stolen article in the closet and observed a toolbox in the room. (*Id.* at pp. 673–674.) He found a gun in the toolbox and removed it and two other articles believed to have been stolen. (*Id.* at p. 674.)

The appellate court characterized the defendant's right to occupy the dorm room as being "quite different from the usual relationship of landlord and tenant" (*Kelly, supra,* 195 Cal.App.2d at p. 678), apparently placing considerable reliance upon the housing rules: "[The defendant's] occupancy of the room was conditional upon his accepting the responsibility of practicing the

---

[11] The prosecution did not cite *Kelly* either in its lengthy opposition to the motion to suppress or in its supplemental briefing. Accordingly, the court below did not mention *Kelly* in its order and apparently did not consider the case in reaching its decision.

[12] We note that in 1982, the Supreme Court decided a case in which it assumed (without expressly stating) that the Fourth Amendment applies to the search of a state university dormitory room. (See *Washington v. Chrisman* (1982) 455 U.S. 1 [70 L.Ed.2d 778, 102 S.Ct. 812].) In that case, the Supreme Court, applying the plain-view doctrine, found constitutional the warrantless search of the defendant's dorm room and the ensuing seizure of marijuana, LSD, and a pipe used for smoking marijuana found in the room. (*Id.* at pp. 6–7.)

school's traditional principle of personal honor and upon his agreeing to abide by the house rules." (*Id.* at p. 677.) It found further that the defendant, through the rules, had implicitly agreed that the house master might enter the room for the purpose of "upholding the high disciplinary standards and integrity of the school." (*Id.* at p. 678.) The *Kelly* court upheld the denial of the motion to suppress, based upon (1) the police having reasonable cause to believe that the defendant had participated in a series of burglaries; (2) the general authority that the house master possessed over the occupancy and use of the dorm rooms; (3) the house master telling the police that he had the authority to enter rooms and that the housing rules specifically permitted such entry in an emergency; and (4) the police officer's assertion that a felony investigation constituted an emergency. (*Id.* at pp. 676–677.) It concluded: "The evidence was sufficient to support a finding that the officers believed in good faith that the master had authority to permit them to enter the room." (*Id.* at p. 677.)

### 2. *Out-of-state college dormitory search cases*

As one authority has observed: "[I]n the case of the [college dormitory] room, . . . the educational institution's position is more akin to that of any other landlord. This being the case, courts are understandably reluctant to put the student who has the college as a landlord in a significantly different position than 'a student who lives off campus in a boarding house.' The latter student is quite obviously protected by the Supreme Court's ruling in *Chapman*[, *supra*, 365 U.S. 610,] that a landlord may not consent to a police search of his tenant's quarters merely because he has some right of entry of his own in connection with his position as landlord. . . . [T]he same may be said of the college landlord." (4 LaFave, Search and Seizure (4th ed. 2004) § 8.6(e), pp. 260–261, fns. omitted.) Consistent with this viewpoint, there are cases at odds with *Kelly*, in which courts in other jurisdictions have held unreasonable the warrantless police searches of college dormitory rooms, even where school officials themselves had the lawful right of entry and gave the police consent.

For instance, an Ohio appellate court held recently that "[a] college student's dormitory room is entitled to the same protection against unreasonable search and seizure that is afforded to a private home for purposes of the Fourth Amendment." (*State v. Ellis* (Ohio Ct.App., Mar. 31, 2006, No. 05CA78) 2006 WL 827376 (*Ellis*), ¶ 13.) In *Ellis*, Central State University resident assistants discovered marijuana in the defendant's dorm room while they were conducting an authorized, unannounced safety inspection. (*Id.* at ¶¶ 8, 9.) Campus police officers were then notified and went to

the room. (*Id.* at ¶ 10.) While the campus police did not participate in the search, they were present in the room at the resident assistants' invitation. (*Ibid.*) The *Ellis* court concluded that the seizure of the marijuana was unconstitutional. (*Id.* at ¶ 20.) It found that while the resident assistants' search was authorized under the university's policies and procedures (*id.* at ¶ 15), the later police entry into the room was unlawful because it was made without a warrant, consent, or exigent circumstances. (*Id.* at ¶¶ 18, 19.) The court explained: "The problem arises in this case because, after the resident advisors initially discovered marijuana in [the] Defendant's room and notified campus police, the campus police then came to the scene and *entered* [the] Defendant's room. . . . [¶] By entering [the] Defendant's dormitory room, campus police infringed upon the reasonable expectation of privacy that [the] Defendant had in that place which . . . is entitled to the same level of protection against unreasonable search and seizure as a private home. [Citation.] In order to lawfully enter [the] Defendant's room, police needed either a warrant, which they did not have, or an established exception to the warrant requirement." (*Id.* at ¶¶ 17, 18.)[13]

Similarly, in *Piazzola v. Watkins* (5th Cir. 1971) 442 F.2d 284, the court invalidated a warrantless search of several Troy State University dormitory rooms conducted by the police in conjunction with school officials. There, a regulation provided that " '[t]he college reserves the right to enter rooms for inspection purposes.' " (*Id.* at p. 286.) In holding that the search was unreasonable, the Fifth Circuit stated: "[A] student who occupies a college dormitory room enjoys the protection of the Fourth Amendment. True the University retains broad supervisory powers which permit it to adopt the regulation heretofore quoted, provided that regulation is reasonably construed and is limited in its application to further the University's function as an educational institution. The regulation cannot be construed or applied so as to give consent to a search for evidence for the primary purpose of a criminal prosecution. Otherwise, the regulation itself would constitute an unconstitutional attempt to require a student to waive his protection from unreasonable searches and seizures as a condition to his occupancy of a college dormitory room. [Citation.] Clearly the University had no authority to consent to or join in a police search for evidence of crime." (*Id.* at pp. 289–290, fns. omitted.)[14]

---

[13] In so concluding, the *Ellis* court relied on an earlier decision of the Ohio Supreme Court. (See *Athens v. Wolf* (1974) 38 Ohio St.2d 237, 240 [313 N.E.2d 405]: "[A] dormitory room is 'home' to large numbers of students who attend universities in this state. Because of the very nature of dormitory life, privacy is a commodity hard to come by, however much desired. . . . [¶] . . . [The defendant] is entitled to more than a modicum of privacy in his dormitory room. As regards intrusions by law enforcement officials, we hold that [the defendant] is entitled to Fourth Amendment protection.")

[14] See also *Commonwealth v. McCloskey* (1970) 217 Pa.Super. 432, 435–436 [272 A.2d 271, 273]: "A dormitory room is analogous to an apartment or a hotel room. . . . [The fact that] the lessor, Bucknell University, reserved the right to check the room for damages, wear and

Likewise, in *Commonwealth v. Neilson* (1996) 423 Mass. 75 [666 N.E.2d 984], the court held unreasonable the police search of the defendant's dormitory room at Fitchburg State College, which was conducted without a warrant, consent, or exigent circumstances after college officials had discovered marijuana plants in the room. In so doing, the court rejected the commonwealth's contention that, because the defendant had signed a resident contract authorizing college officials to conduct reasonable searches to enforce college health and safety regulations, the police had received the consent of the defendant (through the college) to enter the dorm room. (*Id.* at p. 987.)

Finally, in *People v. Cohen* (1968) 57 Misc.2d 366 [292 N.Y.S.2d 706, 709], the court rejected the argument that the defendant (a Hofstra University student) gave his implied consent to a police search of his dormitory room under the theory that "a student impliedly consents to entry into his room by University officials at any time, except at late hours." After noting that the search conducted by police and university officials was "a fishing expedition calculated to discover narcotics" (*ibid.*), the court concluded that "even if the doctrine of implied consent were imported into this case, the consent is given, not to police officials, but to the University and the latter cannot fragmentize, share or delegate it." (*Ibid.*; see also Smith & Strope, *The Fourth Amendment: Dormitory Room Searches in Public Universities* (1995) 97 Ed. Law Rep. 985, 987 [where student signs waiver giving university officials permission to search dorm room for health, safety or maintenance reasons, "officials cannot delegate their authority to other individuals to conduct a search for other reasons"].)[15]

---

unauthorized appliances . . . does not mean [the defendant] was not entitled to have a 'reasonable expectation of freedom from governmental intrusion', or that he gave consent to the police search, or gave the University authority to consent to such search." (Fn. omitted.) *McCloskey, supra,* at pages 435–436, was quoted extensively by the court in *Piazzola v. Watkins, supra,* 442 F.2d at pages 287–288.

[15] Other cases have similarly upheld the university student's Fourth Amendment right to be free from unreasonable searches and seizures in connection with his or her dormitory room occupancy. (See *Morale v. Grigel* (D.N.H. 1976) 422 F.Supp. 988 [search of dorm room by college was state action violating student's Fourth Amendment rights]; *Smyth v. Lubbers* (W.D.Mich. 1975) 398 F.Supp. 777 [search of dorm room by college officials with sheriff violated student's expectation of privacy, rejecting argument that college dormitory setting should be exempt from warrant requirement]; *Beauchamp v. State* (Fla.Dist.Ct.App. 1999) 742 So.2d 431 [police entry and search of dorm room after student refused permission invalid]; *Devers v. Southern University* (La.Ct.App. 1998) 712 So.2d 199 [dorm sweep for drugs by college violated students' Fourth Amendment rights]; but see *Moore v. Student Affairs Committee of Troy State Univ.* (D.C.Ala. 1968) 284 F.Supp. 725 (*Moore*) [search of dorm room by college with narcotics agents valid where regulations gave college right to inspect dorm rooms and regulations reasonably applied]; *State v. Kappes* (1976) 26 Ariz.App. 567 [550 P.2d 121] [dorm room search by college officials done as private persons and Fourth Amendment not implicated; after officials discovered marijuana and pipe used to smoke marijuana, they were justified in admitting police]; *State v. Hunter* (Utah Ct.App. 1992) 831 P.2d 1033 [dorm

### C. *Analysis of Third Party Consent Argument*

As we have noted, valid third party consent to a warrantless search occurs where the party giving that consent "possesses common authority over the premises." (*Rodriguez, supra,* 497 U.S. 177, 181; see also *People v. Boyer, supra,* 38 Cal.4th at p. 445.) That common authority is founded "on mutual use of the property by persons generally having joint access or control for most purposes." (*Matlock, supra,* 415 U.S. 164, 171, fn. 7.) And the burden rests with the People to establish the existence of common authority supporting the contention that the search was based on third party consent. (*Rodriguez, supra,* at p. 181.) Also, where the facts available to the officer at the time of the search would lead a reasonable person to believe "that the consenting party had authority over the premises" (*id.* at p. 188), the search is valid even if it ultimately turns out that no actual authority to consent existed. (*Id.* at pp. 188–189.)

We therefore examine whether the police officers' warrantless entry into defendant's dorm room and their seizure of the contraband were justified by third party consent, based upon either actual or apparent authority.

### 1. *Actual authority*

We evaluate whether the University possessed common authority over defendant's dormitory room sufficient for it to give valid third party consent. (*Rodriguez, supra,* 497 U.S. at p. 181.) We start by reiterating the Supreme Court's caution that common authority is not determined merely by virtue of the third party's interest in the property. (*Matlock, supra,* 415 U.S. at p. 171, fn. 7.) Here, the University's property interest notwithstanding, its relationship to the dormitories (specifically, to defendant's dorm room) is atypical of instances in which courts have found third party consent based upon common authority. This is not a case in which the third party allegedly giving consent—the University employee—had common authority over the dorm room. It differs greatly from the case of consent given by a spouse of a home's occupant (*Coolidge, supra,* 403 U.S. at pp. 488–489), or by the host-homeowner who offered lodging to a guest (*People v. Welch, supra,* 20 Cal.4th at pp. 747–748). Rather, the relationship between the University, defendant, and defendant's dormitory room is more closely akin to relationships in which the Supreme Court has rejected third party consent arguments,

---

room search by college official with police valid because reasonable under housing regulations and search not at behest of police]; *Duarte v. Commonwealth* (1991) 12 Va.App. 1023 [407 S.E.2d 41] [search of dorm room by college officials valid because it was entry by private persons and Fourth Amendment not implicated].)

such as landlord-tenant (*Chapman, supra,* 365 U.S. 610) or hotel-occupant relationships (*Stoner, supra,* 376 U.S. 483). (See also *People v. O'Keefe* (1990) 222 Cal.App.3d 517, 521 [271 Cal.Rptr. 769] [college dormitory "analogous to a hotel or apartment complex," and "each student lives and enjoys separate privacy in each of their individual dormitory rooms"].) In this respect, borrowing the Supreme Court's language in *Stoner, supra,* at page 489, "[i]t is important to bear in mind that it was [defendant-student's] constitutional right which was at stake here, and not the [security officer's] nor the [University's]."

Within the plain language of *Matlock,* the University had neither "mutual use" of defendant's dorm room, nor "joint access or control for most purposes" over it. (*Matlock, supra,* 415 U.S. at p. 171, fn. 7.) Likewise, it could hardly be said that defendant "assumed the risk that [the University] might permit" inspection of his dorm room by others, such as the police. (*Ibid.*; see also *Commonwealth v. Neilson, supra,* 666 N.E.2d at p. 987.) On the surface, therefore, the University did not have common authority over the dorm room.[16]

We perceive of no legitimate reason to distinguish between privacy expectations reasonably enjoyed by college students in occupying dormitory rooms with those experienced by tenants occupying houses or apartments. Nor do we believe that college students should have less protection from unreasonable searches and seizures in their dorm rooms than occupants have in their hotel rooms.[17] The "physical entry of the home is the chief evil

---

[16] As Justice Souter recently explained, the third party consent exception to the proscription against warrantless searches and seizures is founded in significant part on the "commonly held understanding about the authority that co-inhabitants may exercise in ways that affect each other's interests." (*Georgia v. Randolph, supra,* 126 S.Ct. at p. 1521.) "A person on the scene who identifies himself, say, as a landlord or a hotel manager calls up no customary understanding of authority to admit guests without the consent of the current occupant. [Citations.]" (*Id.* at p. 1522.) Like a landlord or a hotel manager, here the University's exertion of administrative control over a dormitory suggests no customary understanding that it has the authority to admit third persons into an individual dorm room absent the student-occupant's consent.

[17] Even minor students have "fundamental constitutional rights which the state must respect." (*In re William G., supra,* 40 Cal.3d 550, 556.) Students do not "shed their constitutional rights . . . at the schoolhouse gate." (*Tinker v. Des Moines School Dist.* (1969) 393 U.S. 503, 506 [21 L.Ed.2d 731, 89 S.Ct. 733]; see also *New Jersey v. T. L. O.* (1985) 469 U.S. 325 [83 L.Ed.2d 720, 105 S.Ct. 733] [rejecting contention that minor schoolchild has no reasonable expectation of privacy].) Although we acknowledge that searches of minor schoolchildren are subject to a more relaxed Fourth Amendment standard for searches at their schools than is applicable for adults (see *Board of Ed. of Independent School Dist. No. 92 of Pottawatomie Cty. v. Earls* (2002) 536 U.S. 822 [153 L.Ed.2d 735, 122 S.Ct. 2559]; *In re William G., supra,* 40 Cal.3d 550), that principle is inapplicable here. Defendant here is an adult who has the same expectation of privacy and right to be free from unreasonable governmental searches in his dormitory room as any other adult would have in his residence.

against which the wording of the Fourth Amendment is directed." (*United States v. United States District Court* (1972) 407 U.S. 297, 313 [32 L.Ed.2d 752, 92 S.Ct. 2125]; see also *People v. Sanders* (2003) 31 Cal.4th 318, 324 [2 Cal.Rptr.3d 630, 73 P.3d 496].) We agree with (among others) the federal District Court of New Hampshire and the Western District of Michigan, respectively, that "[a] dormitory room is a student's home away from home" (*Morale v. Grigel, supra*, 422 F.Supp. at p. 997), and defendant's "dormitory room is his house and home for all practical purposes, and he has the same interest in the privacy of his room as any adult has in the privacy of his home, dwelling, or lodging" (*Smyth v. Lubbers, supra*, 398 F.Supp. at p. 786). (Contra, *Moore, supra*, 284 F.Supp. at pp. 729–731 [students living in on-campus dorms have "special relationship with the college," college may adopt regulations "to protect campus order and discipline," and resident student "waives objection to any reasonable searches conducted pursuant to reasonable and necessary [college] regulations"]; *Kelly, supra*, 195 Cal.App.2d at p. 677 [student's dorm room occupancy "conditional upon his accepting the responsibility of practicing the school's traditional principle of personal honor and upon his agreeing to abide by the house rules"]; *State v. Kappes, supra*, 550 P.2d at p. 124 [privacy rights under Fourth Amendment "do[] not include freedom from reasonable inspection" of dorm room by college officials].) As such, the dormitory—in the case of a student-occupant who is an adult (as is the case with defendant here)—may serve as a residence for voter registration purposes. (See *Walters v. Weed* (1988) 45 Cal.3d 1 [246 Cal.Rptr. 5, 752 P.2d 443].) Therefore, we conclude that defendant enjoyed the same Fourth Amendment protection from unreasonable searches and seizures in his dormitory room as would any other citizen in a private home. (See, e.g., *Morale v. Grigel, supra*, at p. 997; *Smyth v. Lubbers, supra*, at p. 786; *Devers v. Southern University, supra*, 712 So.2d at pp. 204–205; *Ellis, supra*, 2006 WL 827376 at ¶ 13].)

Our conclusion is not altered by the fact that defendant signed a Housing Contract that authorized the University (1) to conduct routine room inspections on reasonable notice to the resident student, and (2) to enter rooms without notice "where there is a reasonable suspicion that a violation of the law or University policies is occurring or has occurred inside a particular room." These terms of occupancy, while constituting consent to the *University's* entry into defendant's dorm room under certain circumstances, cannot be reasonably construed as defendant having given such consent to *others*. (See *Piazzola v. Watkins, supra*, 442 F.2d at pp. 289–290; *Commonwealth v. Neilson, supra*, 666 N.E.2d at p. 987.) In particular, these contract terms do not constitute defendant's agreement to nonconsensual warrantless searches and seizures of his private residence by the police. (Contra, *Moore, supra*,

284 F.Supp. at pp. 730–731.) Nor could the Housing Contract be so construed, since such purported advance consent to warrantless police searches would be an illegal waiver of defendant's constitutional rights under the Fourth Amendment. (See *Piazzola v. Watkins, supra,* at p. 289 [regulation authorizing college to inspect dorm rooms could not be interpreted as student's "consent to a search for evidence for the primary purpose of a criminal prosecution" (fn. omitted)]; *Devers v. Southern University, supra,* 712 So.2d at pp. 204–207 [lease provision reserving college's right to inspect dorm room with police unconstitutionally abridged student's Fourth Amendment rights]; cf. § 626.11, subd. (b) [purported waiver of student-occupant's protection from unreasonable search and seizure in college housing agreement void].)[18]

We therefore conclude that the University had no actual authority to give valid third party consent to a police search of defendant's dorm room.[19]

## 2. *Apparent authority*

We have concluded that the University did not have actual common authority over defendant's dormitory room to consent to a police search or seizure. But if the police officers' entry into defendant's dorm room was based upon their reasonable (but mistaken) belief that University employee Payne had the authority to consent to that entry, the police search and seizure would be deemed to have been reasonable. (*Rodriguez, supra,* 497 U.S. 177.)

 As the Supreme Court has explained, the question of apparent authority is determined objectively by asking whether " 'the facts available to the officer at the moment . . . "warrant a man of reasonable caution in the belief" ' that the consenting party had authority over the premises. [Citation.]" (*Rodriguez, supra,* 497 U.S. at p. 188, quoting *Terry v. Ohio* (1968)

[18] In their opposition to the motion filed below, the People asserted that defendant had waived any privacy rights by signing the Housing Contract that permitted the University to enter his dormitory room. The People likened this agreement to a search condition imposed on a person convicted of a crime who is granted probation or parole. The People have not made this argument in this writ proceeding, and we therefore deem it abandoned. In any event, we reject any assertion that defendant's agreement to permit the University to inspect his dorm room constituted a waiver of his Fourth Amendment rights. (Cf. § 626.11, subd. (b).)

[19] *Kelly, supra,* 195 Cal.App.2d 669, does not stand for the proposition that a college official has *actual authority* to give third party consent on behalf of a resident student to a warrantless police search or seizure of a dorm room under the circumstances before us. As discussed, *post,* the *Kelly* court's conclusion upholding the validity of the search rested upon the conclusion that the police had a good faith belief that the college master could consent to the search on the student's behalf. (*Id.* at pp. 677, 679.) To the extent, however, that *Kelly* may be construed as standing for the proposition that a student residing in a college dormitory room does not enjoy the full protections under the United States and California Constitutions to be free from unreasonable searches and seizures, we reject that conclusion.

392 U.S. 1, 21–22 [20 L.Ed.2d 889, 88 S.Ct. 1868].) If the answer is "yes," the warrantless search is valid. (*Rodriguez, supra*, at pp. 188–189.) And as the Supreme Court has made plain, "in order to satisfy the 'reasonableness' requirement of the Fourth Amendment, what is generally demanded of the many factual determinations that must regularly be made by agents of the government—. . . the police officer conducting a search or seizure under one of the exceptions to the warrant requirement—is not that they always be correct, but that they always be reasonable." (*Id.* at p. 185.)

The People, citing *Rodriguez, supra*, 497 U.S. 177, and *Kelly, supra*, 195 Cal.App.2d 669, argue that the police had a reasonable basis for believing that Payne could consent to their entry. Defendant, citing *Chapman, supra*, 365 U.S. 610, and *People v. Escudero, supra*, 23 Cal.3d 800, 807, responds that a landlord may not consent to a police search of a tenant's property—and thus argues (inferentially) that apparent authority is inapplicable in this instance because the University was essentially acting as defendant's landlord.

The police officers asked whether Payne had received consent to search the room. Payne responded in part that he had defendant's consent. By itself, this was insufficient to support a finding of reasonableness. This inquiry and Payne's response concerned only whether *the University officials* had the right to be in defendant's dorm room; it did not address whether the University could consent on defendant's behalf to a police search or seizure of the room. In the ordinary case, the police may not reasonably rely on a landlord's claimed authority over a rented room as being a sufficient basis for consent to a search. (See *Chapman, supra*, 365 U.S. at pp. 616–618; *People v. Escudero, supra*, 23 Cal.3d at p. 807 [ranch owner could not give consent to search of foreman's house under principle that landlord may not ordinarily consent to police entry of premises occupied by tenant].) Likewise, here, the relationship between the University and the student-resident, defendant, was akin to a landlord-tenant relationship, and the mere fact that Payne stated that he had defendant's consent to search the room did not give rise to a reasonable conclusion that that University official could agree to a police search of the room on defendant's behalf. (See *Piazzola v. Watkins, supra*, 442 F.2d at pp. 289–290.)

Payne's additional response to the police that defendant's consent was unnecessary "because of the waiver the defendant had signed in" the Housing Contract was also insufficient to support the reasonableness of the search. This was not a direct statement that Payne could consent to the officers' entry or that defendant had expressly given him that right of consent. Absent clarification as to what Payne meant by the defendant's "waiver" in the Housing Contract, the police could not have reasonably concluded that Payne had the authority to consent to a search of the dorm room.

But *Kelly, supra,* 195 Cal.App.2d 669, might support a contrary conclusion, i.e., that the officers' conduct was reasonable solely on the basis of Payne's two statements concerning defendant's consent and Housing Contract "waiver." In *Kelly,* the appellate court held that there was sufficient evidence—including the house master's statement to the officers that he had free inspection rights to all dorm rooms and the housing rules permitted entry into the defendant's room in an emergency—supporting the finding "that the officers believed in good faith that the [college] master had authority to permit them to enter the [dorm] room." (*Id.* at p. 677.)[20]

 We believe that *Kelly* has limited precedential value. *Kelly* was decided nearly 45 years ago, prior to the development of Fourth Amendment law that today controls suppression motions.[21] College life and societal norms as a whole have changed significantly since 1961. Also since *Kelly* was decided, the Legislature, by its enactment of section 626.11 in 1975, gave express recognition to the constitutional rights of college students, including the right of privacy and the right to be free from unreasonable searches and seizures.[22] That statute made inadmissible in any administrative proceeding any evidence seized by officials of any University of California,

---

[20] The *Kelly* court did not specifically state that the officers' good faith belief that the college master had the authority to consent to the search *was reasonable.* But the court (*Kelly, supra,* 195 Cal.App.2d at pp. 678–679) cited and discussed *People v. Gorg* (1955) 45 Cal.2d 776 [291 P.2d 469], and a case following *Gorg, People v. Caritativo* (1956) 46 Cal.2d 68 [292 P.2d 513]. The principle in *Gorg,* as later restated by the Supreme Court, was "that a search is not unreasonable if made with the permission of one who, by virtue of his relationship to the defendant or other circumstances, the officers *reasonably* and in good faith believed had authority to consent to their entry." (*Bielicki v. Superior Court* (1962) 57 Cal.2d 602, 607 [21 Cal.Rptr. 552, 371 P.2d 288], italics added.) We therefore infer that the *Kelly* court concluded that the police officers *reasonably* relied in good faith on the master's authority to consent to the search.

[21] *Kelly* preceded (among others) the following Supreme Court Fourth Amendment cases: *Rodriguez, supra,* 497 U.S. 177; *Payton v. New York, supra,* 445 U.S. 573; *Matlock, supra,* 415 U.S. 164; *Coolidge, supra,* 403 U.S. 443; *Katz v. United States, supra,* 389 U.S. 347; *Stoner, supra,* 376 U.S. 483. The *Kelly* court also made no reference to *Chapman, supra,* 365 U.S. 610, which was decided five months before *Kelly.* In addition, *Kelly* has been cited in only three published California cases (the most recent of which was decided in 1963). (See *Bielicki v. Superior Court, supra,* 57 Cal.2d at p. 607; *People v. Shepard* (1963) 212 Cal.App.2d 697, 701 [28 Cal.Rptr. 297]; *People v. Hanson* (1961) 197 Cal.App.2d 658, 665 [17 Cal.Rptr. 334].) None of those California cases concerned the reasonableness of a warrantless search of a college dormitory room.

[22] The findings of the Legislature in its enactment of section 626.11 are relevant here. "The Legislature finds and declares that students in school as well as out of school are 'persons' under the Constitution and that they are possessed of fundamental rights which the state must respect, just as they themselves must respect their obligations to the state. The Legislature further finds and declares that the right to privacy and other related rights are fundamental." (Stats. 1975, ch. 867, § 2, p. 1940.) And "[i]t is the intent of the Legislature in enacting this act to exercise the police power for the purposes of protecting the rights of privacy and related other rights and other constitutional rights of persons renting or leasing rooms in student

California state university, or public community college, in violation of another's constitutional rights (§ 626.11, subd. (a)); declared that any provision in such an institution's housing agreement purporting to waive the student-occupant's protection from unreasonable searches and seizures was against public policy and void (§ 626.11, subd. (b)); and made inadmissible in any administrative proceeding any evidence seized by officials of any such institution through a nonconsensual search of a dormitory room, where the evidence was "not directly related to the purpose for which the entry was initially made" (§ 626.11, subd. (c)).

Moreover, it is questionable whether *Kelly*'s reasoning—including its seemingly antiquated view that the college student had impliedly agreed that the house master could search the dorm room to uphold the disciplinary standards and integrity of the institution (*Kelly, supra,* 195 Cal.App.2d at pp. 677–678)—would pass constitutional muster today.[23] As the district court reasoned in *Morale v. Grigel, supra,* 422 F.Supp. at page 997: "While the school also has a 'legitimate interest in preventing disruption on the campus,' [citation], its interests are limited by its function as an educational institution. A college cannot, in this day and age, protect students under the aegis of *in loco parentis* authority from the rigors of society's rules and laws, just as it cannot, under the same aegis, deprive students of their constitutional rights." We therefore conclude—*Kelly* and its reasoning notwithstanding—that Payne's statements, by themselves, were insufficient to justify police entry into the dorm room under apparent authority.

But as the People point out, the case before us differs from *Kelly* in that here the University solicited the police investigation. Further—and also unlike *Kelly*—defendant was present when the police entered his room, and the search was conducted in his presence. Defendant was standing near the doorway when Payne told the police officers that he had defendant's consent but that it was unnecessary because of the "waiver" in the Housing Contract. While defendant's silence in the face of Payne's statements did not constitute his implied consent to the police search (see *People v. Shelton* (1964) 60

---

dormitories owned or operated by any state university, state college, or community college." (Stats. 1975, ch. 867, § 3, p. 1940.)

[23] *Kelly*'s holding seems in large part tethered to the questionable view that the defendant's reasonable expectation of privacy in occupying the dorm room was significantly less than that of a tenant in "the usual relationship of landlord and tenant." (*Kelly, supra,* 195 Cal.App.2d at p. 678.) In our view, the reasoning of cases discussed above (see *Piazzola v. Watkins, supra,* 442 F.2d 284, *Commonwealth v. Neilson, supra,* 666 N.E.2d 984, *Commonwealth v. McCloskey, supra,* 272 A.2d 271, and *People v. Cohen, supra,* 292 N.Y.S.2d 706)—holding that the Fourth Amendment prevents unreasonable searches of college students' dormitory rooms and concluding that any consent to search given to the college is not transferable to the police—is more in line with constitutional principles.

Cal.2d 740, 746 [36 Cal.Rptr. 433, 388 P.2d 665]),[24] it is an additional factor to consider in evaluating the reasonableness of the officers' belief in Payne's apparent authority.[25]

In reviewing this issue, we note that courts in other jurisdictions have upheld warrantless searches (many involving vehicles) under the apparent authority doctrine, based in part upon the defendant's (1) knowledge of the third party's consent and (2) acquiescence in the subsequent police search. For instance, in *U.S. v. Elam* (8th Cir. 2006) 441 F.3d 601, 603 (*Elam*), the lessee of the home in which the defendant lived agreed—in the defendant's presence—that the police could search the home for evidence of methamphetamine production. During the course of the search, the police encountered a locked cabinet in a common closet; the tenant retrieved a key to the cabinet and gave it to the officer while the defendant stood mute. (*Ibid.*) The court concluded that the officer's belief that the tenant had authority to consent to search the locked cabinet was reasonable. (*Id.* at pp. 603–604.) In so doing, the court, citing *U.S. v. Stapleton* (8th Cir. 1993) 10 F.3d 582,[26] emphasized

---

[24] The People do not argue that the police entry into the room and seizure of the contraband was based upon *defendant's* consent. Payne, in defendant's presence, told the police that he had the student's consent and that he did not need that consent in any event because of defendant's "waiver" contained in the Housing Contract. But defendant's silence, absent an affirmative statement or conduct, cannot be construed here as his giving the police implied consent to enter his dorm room. (See *U.S. v. Shaibu* (9th Cir. 1990) 920 F.2d 1423, 1427; *People v. Superior Court (Arketa)* (1970) 10 Cal.App.3d 122, 127 [89 Cal.Rptr. 316]; but see *People v. Harrington* (1970) 2 Cal.3d 991, 995 [88 Cal.Rptr. 161, 471 P.2d 961] [implied consent found where the defendant stepped aside and gestured to officer indicating permission for officer to enter room].)

[25] Our colleague states in his concurring opinion that we have concluded here that "defendant's silence in the face of Payne's statements somehow . . . cloak[ed] the security officer with apparent authority to consent to the police entry" (conc. opn., *post*, at p. 1220), and that we have "implie[d] that there is a 'silent presence' exception to [the] body of law" that holds that neither a landlord (*Chapman, supra*, 365 U.S. 610) nor hotel manager (*Stoner, supra*, 376 U.S. 483) may give valid third party consent to a police search of a tenant's dwelling or hotel occupant's room, respectively. (Conc. opn., *post*, at p. 1221.) We disagree with those characterizations. As we discuss, defendant's silence after Payne told the police that that he had the student's consent and that he did not need that consent in any event because of defendant's "waiver" contained in the Housing Contract is simply one factor that could be considered here in resolving whether the police entry was justified under apparent authority. (See *People v. Ingle* (1960) 53 Cal.2d 407, 412 [2 Cal.Rptr. 14, 348 P.2d 577] [reasonableness of police conduct determined by facts and circumstances of individual case].) In so concluding under the unique facts of this case, we do not hold that defendant's silence of itself "cloak[ed] the security officer with apparent authority," nor do we undercut the *Chapman/Stoner* line of cases by creating an unprecedented exception to the apparent authority doctrine.

[26] *U.S. v. Stapleton, supra*, 10 F.3d 582, concerned a police search of a vehicle with the driver's consent, which resulted in the seizure of cocaine found in a cell phone located on the floorboard of the passenger's seat. (*Id.* at p. 583.) The court upheld the validity of the search on the basis that "it was objectively reasonable for the patrolmen to conclude either that they had all the consent that was constitutionally required (from [the driver]), or that they had [the

that the defendant was silent and gave no indication to the police that he had an interest in the cabinet or that he did not give his permission to the search. (*Elam, supra,* at p. 604.)

Similarly, in *State v. Tomlinson* (2002) 2002 WI 91 [648 N.W.2d 367, 254 Wis.2d 502] (*Tomlinson*), the defendant's teenaged daughter answered the door and admitted the officers into the home. (*Id.* at p. 376.) As she did so, the defendant stood behind her and did not object. (*Ibid.*) Concluding that the police had a reasonable basis to conclude that the daughter's consent to enter the house was valid, the court gave "weight to the fact that [the defendant] was nearby when the door was opened [and] did not object to the police coming in." (*Id.* at p. 377.)

In *Elam* and *Tomlinson*—as well as in the vehicle-search cases we have noted (see fn. 26, *ante*)—the common denominator relevant here is the defendant's silence in the face of the third party's consent to search the defendant's property and the resulting police search. There are, of course, factors that are distinguishable from the case before us. Unlike most of those cases, here the police could have had no doubt as to defendant's interest in the dorm room. Furthermore—unlike the occupant of a home or the driver of a vehicle—here, the police could not have properly considered the University's interest in the dorm room to have been coextensive with defendant's interest.

▇ In our evaluation of the reasonableness of the officers' conduct, "we are mindful of the rule applicable to unprecedented factual situations involving the reasonableness of police conduct as restricted by the Fourth Amendment. 'There is no exact formula for the determination of reasonableness.' " (*People v. Superior Court (York)* (1970) 3 Cal.App.3d 648, 659 [83 Cal.Rptr. 732].) Here, however, we need not decide the issue of whether the police

---

defendant's] implied consent." (*Id.* at p. 584.) In so holding, the court emphasized that, after the driver consented to the search, the defendant (in whose name the cell phone was registered) "remained silent when told of the search and the object of the search, and he did not indicate that the telephone was his property and that the patrolmen did not have his permission to search it." (*Ibid.*) A number of other courts have similarly upheld the validity of a vehicle search under the apparent authority doctrine, where the driver consented and the defendant/owner of the personal property inside the vehicle was aware of that consent and said nothing. (See, e.g., *U.S. v. Langston* (10th Cir. 1992) 970 F.2d 692, 697–698; *U.S. v. Anderson* (3d Cir. 1988) 859 F.2d 1171, 1176–1177; *State v. Walton* (Fla.Dist.Ct.App. 1990) 565 So.2d 381, 384 ["a significant fact here [on the issue of apparent authority] is [the defendant's] tacit acquiescence" in the driver's consent and subsequent search]; *State v. Rawls* (La.Ct.App. 1989) 552 So.2d 764, 765–767.)

reasonably believed that Payne had authority to consent to their entry, because as we discuss below, the contraband would have been inevitably discovered.[27]

## V. Inevitable Discovery Doctrine

The People argue as an additional reason that the suppression motion should have been denied: "Although the police conduct in this case was not improper, it was inevitable that after completing its private search, the University would have turned the marijuana and marijuana paraphernalia over to the Santa Clara Police." Therefore (the People argue) the inevitable discovery doctrine should have been applied by the court below to prevent operation of the exclusionary rule. The court below found that the inevitable discovery doctrine did not apply because it was not supported by the evidence.[28] Assuming that the warrantless search was unreasonable, we find that the contraband would have been inevitably discovered.

 The inevitable discovery doctrine operates as an exception to the exclusionary rule: Seized evidence is admissible in instances in which it would have been discovered by the police through lawful means. As the United States Supreme Court has explained, the doctrine "is in reality an extrapolation from the independent source doctrine: Since the tainted evidence would be admissible if in fact discovered through an independent source, it should be admissible if it inevitably would have been discovered." (*Murray v. United States* (1988) 487 U.S. 533, 539 [101 L.Ed.2d 472, 108 S.Ct. 2529], italics omitted; see also *Nix v. Williams* (1984) 467 U.S. 431, 442–443 [81 L.Ed.2d 377, 104 S.Ct. 2501].) "The purpose of the inevitable

---

[27] Irrespective of whether the officers' belief that Payne had authority to consent to their entry was reasonable under the circumstances, their entry into the dorm room would not have been problematic had the officers (1) simply asked defendant for his consent to enter the room, or failing that consent, (2) secured the room and obtained a search warrant prior to their entry.

[28] The People contend that the court failed to consider their position concerning inevitable discovery and somehow prevented them from introducing evidence to support that theory. Although the judge who heard the suppression motion acknowledged at the second hearing that he "wasn't thinking about inevitable discovery at [the] time" of the initial hearing, he nonetheless *did* consider the theory and rejected it, finding (among other things) that "it [was] not supported by the evidence." Even had the court not expressly resolved the issue, appellate courts are permitted to decide an inevitable discovery issue if its "factual [basis is] fully set forth in the record. [Citations.]" (*People v. Boyer, supra,* 38 Cal.4th at p. 449.) Because we conclude, *post,* that the evidence supported a finding of inevitable discovery, we need not address the People's second argument that the court precluded them from presenting evidence supporting that theory.

discovery rule is to prevent the setting aside of convictions that would have been obtained without police misconduct." (*People v. Robles, supra,* 23 Cal.4th at p. 800.)[29]

The phrase "inevitable discovery" is somewhat of a misnomer. (Cal. Judges Benchbook: Search and Seizure (Cont.Ed.Bar 2d ed. 2002) § 1.60, p. 39.) The doctrine does not require certainty. (*In re Rudy F.* (2004) 117 Cal.App.4th 1124, 1136 [12 Cal.Rptr.3d 483].) Rather, the People must show a "reasonable probability that [the challenged evidence] would have been procured in any event by lawful means." (*People v. Boyer* (1989) 48 Cal.3d 247, 278 [256 Cal.Rptr. 96, 768 P.2d 610], disapproved on another ground in *People v. Stansbury* (1995) 9 Cal.4th 824, 830, fn. 1 [38 Cal.Rptr.2d 394, 889 P.2d 588].)

Initially, we reject any assertion that the inevitable discovery doctrine applies here simply because the police had sufficient probable cause to obtain a warrant to enter the dorm room and to seize the evidence legally. (See *Hudson v. Michigan* (2006) 547 U.S. ___ [165 L.Ed.2d 56, 126 S.Ct. 2159, 2178] (dis. opn. of Breyer, J.) [government may not rely on inevitable discovery doctrine to "avoid suppression of evidence seized without a warrant . . . simply by showing that it could have obtained a valid warrant had it sought one"].) Such an application of the doctrine—i.e., that the illegally seized evidence should not be excluded because the police *theoretically* could have obtained a warrant—has been rejected by our Supreme Court in *People v. Robles, supra,* 23 Cal.4th 789. There, the primary issue was the validity of a warrantless search of a garage maintained by the defendant and his brother, where the brother had consented in advance to probation searches, but that consent was unknown to the police at the time of the search. (*Id.* at pp. 792–793.) The court held that the unknown consent of the brother did not vitiate the unlawfulness of the search. (*Id.* at p. 800.) The People also argued that the evidence from the illegal search was admissible because it would have been inevitably discovered; they argued that a warrant *could have been obtained* because the police had a plain-view sighting (through a rip in the aluminum siding of the garage door) of the license plate

---

[29] For example, in *People v. Clark* (1993) 5 Cal.4th 950 [22 Cal.Rptr.2d 689, 857 P.2d 1099], the Supreme Court addressed a challenge to the admissibility of a blood sample drawn shortly after the defendant's arrest. In assuming (without deciding) that the police lacked probable cause to draw the sample, the court nonetheless held that it was admissible under the inevitable discovery doctrine. (*Id.* at p. 993.) Because the defendant made statements to the police approximately 30 minutes after the sample was drawn that would have inevitably prompted the police to draw his blood, the court held that the blood sample was admissible. (*Ibid.*)

of the stolen vehicle. (*Id.* at p. 801.) The court rejected that contention, concluding that, absent exigent circumstances, a warrant is required to enter a residence (or, in this instance, a garage), even if contraband is in plain view through a window and the officer observes it from a place that he or she has the right to be. (*Ibid.*; see also *U.S. v. Reilly* (9th Cir. 2000) 224 F.3d 986, 995 [inevitable discovery exception inapplicable " 'to excuse the failure to obtain a search warrant where the police had probable cause but simply did not attempt to obtain a warrant' "].)[30]

But rejection of that rationale does not end our inquiry. Here, the record supports a finding that the contraband would have been inevitably discovered. The University contacted the Santa Clara Police Department to report that "a considerable amount of drugs had been found in a Residence Hall room." The police arrived at the dormitory, met Campus Safety Officer Brady, who then accompanied them to defendant's dorm room, announcing (as he opened the door), "You've got to see this." After Brady opened the door, the large quantity of marijuana and cash were easily visible to the police. It defies logic (and common sense) to conclude that the University safety officers—having contacted the police, gathered the contraband (apparently for inspection by the police), and displayed the contraband to the police—thereafter would have withheld the contraband from the police to pursue their own internal investigation. The probability that the University would have involved the police further is heightened by the fact that the safety officers' investigation had disclosed a potentially significant marijuana sales enterprise on the University campus (evidenced by a "large quantity" of marijuana, several boxes of packaging materials, an electronic scale, and $1,800 cash)—a possible crime that is a far cry from possession of a small quantity of the drug for personal use. While it would not be unreasonable to conclude that the University might have handled a student's possession of a small quantity of marijuana privately, the converse is likewise true where (as here) the student was in possession of a significant quantity of the drug along with evidence of sales activity. In resolving this question, this "court does not leave its common sense at the door. [Citation.]" (*Government Employees Ins. Co. v. Superior Court* (2000) 79 Cal.App.4th 95, 102 [93 Cal.Rptr.2d 820].) Under these circumstances, it is plain that the contraband " 'would have been eventually secured through legal means regardless of the [allegedly] improper official conduct.' " (*People v. Superior Court (Tunch)* (1978) 80 Cal.App.3d 665, 673 [145 Cal.Rptr. 795].)

---

[30] As Professor LaFave has stated: "[I]t makes no sense whatsoever to take the substantially broader step [in applying the inevitable discovery doctrine] of suggesting that a violation of the Fourth Amendment may be disregarded simply because the police, had they thought about the situation more carefully, *could* have come up with a lawful means of achieving their desired results." (6 LaFave, Search and Seizure, *supra*, § 11.4(f), p. 344.)

In reaching the conclusion here that the contraband would have been inevitably discovered, we are mindful of the policy of the doctrine as described by our highest court: "Fairness can be assured by placing the State and the accused in the same positions they would have been in had the impermissible conduct not taken place. However, if the government can prove that the evidence would have been obtained inevitably and, therefore, would have been admitted regardless of any overreaching by the police, there is no rational basis to keep that evidence from the jury in order to ensure the fairness of the trial proceedings. In that situation, the State has gained no advantage at trial and the defendant has suffered no prejudice. Indeed, suppression of the evidence would operate to undermine the adversary system by putting the State in a *worse* position than it would have occupied without any police misconduct." (*Nix v. Williams, supra,* 467 U.S. at p. 447; see also *People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 62 [17 Cal.Rptr.3d 710, 96 P.3d 30].) Application of the exclusionary rule here—and the concomitant refusal to apply the inevitable discovery doctrine—would indeed place the People in a worse position than they would have occupied absent any alleged police misconduct.

The prosecution bears the burden of proving by a preponderance of the evidence that evidence otherwise unlawfully obtained would have been inevitably discovered. (*People v. Coffman and Marlow, supra,* 34 Cal.4th at p. 62; *People v. Carpenter* (1999) 21 Cal.4th 1016, 1040 [90 Cal.Rptr.2d 607, 988 P.2d 531].) On the record before us, we conclude that the prosecution met that burden.[31]

## DISPOSITION

Respondent superior court erred in granting defendant's motion to suppress evidence pursuant to Penal Code section 1538.5. Accordingly, let the peremptory writ of mandate issue commanding the superior court to vacate its order and enter a new order denying defendant's motion to suppress.

Bamattre-Manoukian, Acting P. J., concurred.

---

[31] We have concluded that, assuming that the search was unreasonable, the exclusionary rule should not be applied to bar admission of the contraband because it would have been inevitably discovered. Because of this conclusion, we need not address the People's remaining contentions, namely, that the search and seizure were justified under either the plain-view or the consent-once-removed doctrines. (See *Renita S. v. Superior Court* (1994) 29 Cal.App.4th 553, 559 [34 Cal.Rptr.2d 542] [courts will generally decline addressing issues unnecessary to disposition of case]; see also *People v. Jenkins, supra,* 22 Cal.4th at p. 980, fn. 12 [declining to consider other claimed bases for trial court's denial of suppression motion, including alleged erroneous application of inevitable discovery doctrine, where Supreme Court concluded that motion was properly denied due to third party consent].)

**McADAMS, J.,** Concurring.—I concur in the disposition of this matter based on the doctrine of inevitable discovery. However, I write separately to express my disagreement with portions of the analysis in the majority opinion.

The majority opinion contains an extremely thorough review of the principles of search and seizure, third party consent to search and seizure, college dormitory room searches, and actual authority and apparent authority to give consent to police entry. It convincingly recites how society and the courts have progressed from a view of college officials as substitute parents for a campus of mostly underage students to a contemporary view of the university as an educational community of adults. From this more modern perspective, the legal relationship of the school administration and the dormitory dweller can be seen as analogous to that of property owner and tenant or hotel manager and room occupant.

*Actual Authority*

Applying these principles to this case, I agree with my colleagues that there was no actual authority.

As the majority properly recognizes, the University did not have common authority over defendant's room, and the "relationship between the University, defendant, and defendant's dormitory room is more closely akin to relationships in which the Supreme Court has rejected third party consent arguments, such as landlord-tenant (*Chapman v. [United States* (1961)] 365 U.S. 610 [5 L.Ed.2d 828, 81 S.Ct. 776]) or hotel-occupant relationships (*Stoner v. [California* (1964)] 376 U.S. 483 [11 L.Ed.2d 856, 84 S.Ct. 889])." (Maj. opn., *ante*, at p. 1205.) Thus, I agree with the majority's conclusion that "the university had no actual authority to give valid third party consent to a police search of defendant's dorm room." (Maj. opn., *ante*, at p. 1208.)

*Apparent Authority*

As to apparent authority, I am reluctant to write separately concerning a disagreement with my colleagues over what amounts to dicta, but I cannot agree with the majority analysis in two respects. First, the majority opinion leaves the issue of apparent authority unresolved after ably analyzing the issue—up to a point; I would resolve the issue, finding that it was not reasonable for the police to believe the campus safety officer had the apparent

authority to consent to police entry. Second, the majority finds defendant's silent presence during the entry to be a factor to be considered under the circumstances of this case; I would not.

*Apparent authority cannot rest upon University security officer Payne's statements to the police*

I agree with the introductory statement that the police search and seizure would be valid if the police entry into the room was based upon their reasonable belief that University safety officer Payne had the authority to consent to their entry. Such reasonable belief could only arise from Payne's statements to the police prior to entry: that defendant had given him consent and that consent was unnecessary under the terms of defendant's housing contract.

I agree with the majority that neither of the statements made by University security officer Payne to the police could support a reasonable belief by the officers that Payne had the authority to give consent on defendant's behalf. Neither statement warrants a belief in Payne's authority to consent. As to case law supporting apparent authority based on a college housing contract, I join the majority's criticism of the reasoning in *People v. Kelly* (1961) 195 Cal.App.2d 669 [16 Cal.Rptr. 177] and I agree it should not be followed.

I would conclude the analysis at this point, finding no apparent authority, and proceed to the discussion of inevitable discovery.

*Defendant's silent presence cannot be a factor*

Rather than concluding this portion of the opinion after determining that "Payne's statements, by themselves, were insufficient to justify police entry into the dorm room under apparent authority," the majority opinion continues the analysis by injecting defendant's silent presence into the discussion. (Maj. opn., *ante*, at p. 1211.) My colleagues find defendant's silence during Payne's statements and the police entry as an additional factor to consider under the circumstances of this case. I strongly disagree.

The majority opinion focuses on defendant's presence near the doorway when the police entered and searched his room and when security officer Payne "told the police officers that he had defendant's consent but that it was unnecessary because of the 'waiver' in the Housing Contract." (Maj. opn., *ante*, at p. 1211.) The majority, without any elaboration, then concludes that this silent presence "is an additional factor to consider in evaluating the reasonableness of the officers' belief in Payne's apparent authority." (Maj. opn., *ante*, at p. 1212.)

What possible relevance could defendant's silence have in this case? The implication of the majority's statement and the cases cited from other jurisdictions in support of that finding is that defendant's silence somehow amounts to *acquiescence*. There are at least two problems with such a conclusion.

In the first place, there is nothing in the record to support a finding of acquiescence. By remaining silent, defendant could have been simply yielding to the authority of the police in tandem with the University officers. His silence could be attributed to fear of the academic repercussions of his conduct or to impairment of his cognitive skills for other reasons. It would be pure speculation to find agreement from his silence.

Moreover, even if defendant's lack of response could be considered as acquiescence, exactly what was he accepting? The silence that the majority finds noteworthy occurs after the security officers had entered defendant's room and after the statement by Payne that defendant had given consent—by word and by contract—to *university officials*. Under these circumstances, how was it reasonable for the police officers to believe that Payne had apparent authority to consent to the *police* entry? As the majority recognizes, under long-standing and well-established law, police officers cannot justify entry based on purported third party consent given by property owners and hotel managers or their agents. And as the majority also acknowledges, Payne's statements to the police cannot be the basis for apparent authority. Given this, I am baffled by the unwarranted conclusion that defendant's silence in the face of Payne's statements somehow could cloak the security officer with apparent authority to consent to the police entry. I fail to see how defendant's *silence* in this situation could add anything.

In its discussion, the majority cites two residential search cases from other jurisdictions: *U.S. v. Elam* (8th Cir. 2006) 441 F.3d 601 (*Elam*), and *State v. Tomlinson* (2002) 2002 WI 91 [648 N.W.2d 367] (*Tomlinson*). Neither case aids the majority's analysis.

In *Elam*, the woman who answered the door said she rented the home. She invited the officers in out of the snow, agreed to a search of the premises, signed a written consent form, and retrieved the key for a locked filing cabinet, which was located 10 feet from where defendant sat in silence. The court found that it was reasonable for the officers to believe the woman had authority to consent to the search, and it rejected the defendant's later claim of a superior privacy interest in the cabinet since he failed to either disclose that interest or object to the search. (*Elam, supra*, 441 F.3d at pp. 603–604.)

In *Tomlinson*, the door was answered by a person the officers had good reason to believe was the defendant's daughter. She let them in while the defendant was standing nearby. The court found that the defendant's silence could have led the officers to believe that he "entrusted the girl with at least some authority to give consent to enter." (*Tomlinson, supra*, 648 N.W.2d at p. 377.)

This case before us is factually distinguishable from both *Elam* and *Tomlinson*. Unlike those cases, the person who ostensibly consented here—security officer Payne—is not someone legally capable of giving consent, nor could the police reasonably believe that he was. Payne was neither a renter nor a household member with common authority over the premises. Here, the police officers knew that the room belonged to defendant and they knew that the security officers were not co-occupants or household members.

The case before us is more analogous to a scenario where the police are invited inside a leased dwelling by someone known to be the property owner, who tells the officers that the tenant consented to the owner's entry and that a lease provision allows the owner to enter. (*Chapman v. United States, supra*, 365 U.S. 610.) Our case likewise is closer factually to the situation where a hotel clerk purports to give police consent to search an occupant's hotel room. (*Stoner v. California, supra*, 376 U.S. 483.) A long line of cases cited in the majority opinion, beginning with *Chapman* and *Stoner*, prohibits police entry under such circumstances without a warrant, consent, or exigent circumstances. But the language in the majority opinion in effect implies that there is a "silent presence" exception to that body of law. Such an exception would justify police entry where it would otherwise be prohibited, based on the mere chance that the tenant or occupant happened to be standing silently nearby.

Significantly, elsewhere in its opinion, the majority emphatically states that "defendant's silence in the face of Payne's statements did not constitute his implied consent to the police search." (Maj. opn., *ante*, at p. 1211.) And it ardently insists that "defendant's silence, absent an affirmative statement or conduct, cannot be construed here as his giving the police implied consent to enter his dorm room." (Maj. opn., *ante*, at p. 1212, fn. 24.) I submit that the majority's analysis does exactly that. The majority implies acquiescence from mere silent presence and considers it as a factor supporting apparent authority. Contrary to the disclaimers, the majority's view, by allowing such consideration under the circumstances of this case, would have the effect of construing defendant's silence to be implied consent to the police entry and search.

*Inevitable Discovery*

Regarding inevitable discovery, I concur in the result, but I do not join in that portion of the opinion discussing *Nix v. Williams* (1984) 467 U.S. 431 [81 L.Ed.2d 377, 104 S.Ct. 2501]. I fail to see how the citation to that part of the opinion responding to defendant Williams's Sixth Amendment right to counsel argument advances the analysis in our case.